# CENTRAL RAILROAD COMPANY OF PENNSYLVANIA *v.* PENNSYLVANIA.

No. 400.   Argued March 20, 1962.—Decided June 25, 1962.

*Roy J. Keefer* argued the cause and filed briefs for appellant.

*George W. Keitel,* Deputy Attorney General of Pennsylvania, argued the cause for appellee. With him on the briefs was *David Stahl,* Attorney General.

Mr. Justice Harlan delivered the opinion of the Court.

In this case we must decide whether the Commonwealth of Pennsylvania may, consistently with the Commerce Clause and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States, impose an annual property tax on the total value of freight cars owned by the appellant, a Pennsylvania corporation, despite the fact that a considerable number of such cars spend a substantial portion of the tax year on the lines of other railroads located outside the State. The Supreme Court of Pennsylvania upheld the application of the State's Capital Stock Tax, Purdon's Pa. Stat. Ann., 1949, Tit. 72, §§ 1871, 1901, to the full value of all appellant's freight cars.[1] 403 Pa.

---

[1] The tax imposed by the state statute is denominated a "capital stock tax," but it has been construed by the Pennsylvania courts as being the equivalent of a property tax. *Pennsylvania* v. *Standard Oil Co.,* 101 Pa. 119, 145; *Pennsylvania* v. *Union Shipbuilding Co.,* 271 Pa. 403, 114 A. 257. Property employed by a corporation in its operations in another State and permanently located there is not subject to this tax. *Pennsylvania* v. *American Dredging Co.,* 122 Pa. 386, 15 A. 443. The value of the capital stock subjected to the tax is determined by multiplying the total value of the capital stock, as measured by the worth of all the corporation's real and personal property, by the ratio that the value of such non-exempt property within Pennsylvania (including that temporarily

419, 169 A. 2d 878. We postponed consideration of the question of jurisdiction to the hearing on the merits, 368 U. S. 912, and now find that the appeal is appropriately before us under 28 U. S. C. § 1257 (2). *E. g., Standard Oil Co.* v. *Peck,* 342 U. S. 382.

We take the facts pertinent to decision from a stipulation submitted by the parties to the trial court. The appellant is a Pennsylvania corporation authorized to operate a railroad only within the State. It has not been licensed to do business elsewhere. The company's track runs from the anthracite coal region in Pennsylvania to the Pennsylvania-New Jersey border, at Easton, where it connects with the lines of the Central Railroad Company of New Jersey (hereinafter CNJ), a New Jersey corporation which owns all the outstanding shares of appellant's stock.

In 1951, the year for which the tax was assessed, the appellant owned 3,074 freight cars which were put to use in ordinary transport operations in three ways: (1) by the appellant on its own tracks; (2) by CNJ on that company's tracks in New Jersey; (3) by other unaffiliated railroads on their own lines in various parts of the country. CNJ's use of appellant's cars was pursuant to operating agreements under which CNJ was obliged to pay a daily rental equal to the then-effective rate prescribed by the Association of American Railroads. In order to facilitate interstate transportation by the interchange of equipment among carriers, as prescribed by 49 U. S. C. § 1, pars. (4), (10), (12), the members of the Association,

outside the State) bears to the value of the corporation's property everywhere. Purdon's Pa. Stat. Ann., 1949, Tit. 72, § 1896; *Pennsylvania* v. *Delaware, L. & W. R. Co.,* 145 Pa. 96, 22 A. 157. With reference to this precise taxing measure, this Court has said in the past that it, in practical effect, amounts to "a tax upon the specific property which gives the added value to the capital stock." *Delaware, L. & W. R. Co.* v. *Pennsylvania,* 198 U. S. 341, 357.

including the appellant, had entered into a separate "Car Service and Per Diem Agreement" under which each subscriber was authorized to use on its own lines the available freight cars of other subscribers at the established per diem rental. Consequently, during 1951 many of the appellant's freight cars were also used by other railroads on lines outside Pennsylvania.

Appellant contended in the state courts, as it does here, that in computing its Pennsylvania capital stock tax, which is measured by the value of such property as is not exempt from taxation (note 1, *supra*), it was constitutionally entitled to deduct from the value of its taxable assets a proportional share reflecting the time spent by its freight cars outside Pennsylvania. In support of this claim appellant offered a statistical summary of the use of its freight cars during 1951, seeking to prove that a daily average of more than 1,659 of its 3,074 cars were located on the lines of railroads (including CNJ) which owned no track in Pennsylvania.[2]

It also claimed that a daily average of approximately 1,056 other cars had been used by railroads having lines both within and without Pennsylvania. As to such cars, appellant sought to allocate to Pennsylvania only such portions of their value as the combined ratio of road miles of each user-railroad's tracks within Pennsylvania bore to its total road mileage throughout the United States.[3]

---

[2] If appellant's entire fleet of cars (3,074) is multiplied by the number of days in the year 1951 (365), the total number of "car days" comes to 1,122,010. Appellant's schedules show that 605,678 "car days" were spent on railroads which owned no track in Pennsylvania. If this latter number is divided by 365, the quotient (1,659) represents the average number of cars located on such railroads on any one day during 1951.

[3] For example, appellant computes 91,899 "car days" as having been spent on the lines of the New York Central Railroad. Since 7.36% of that railroad's track mileage is within Pennsylvania, appellant allocates 6,764 "car days," a proportional share, to Pennsylvania.

These claims were disallowed by the Pennsylvania Board of Finance and Revenue, by the Court of Common Pleas of Dauphin County, and by the Supreme Court of Pennsylvania.[4] The state courts relied primarily on this Court's decision in *New York Central R. Co.* v. *Miller,* 202 U. S. 584, which upheld the constitutionality of a domiciliary State's ad valorem property tax levied upon the full value of a railroad's rolling stock, albeit "some considerable proportion of the [railroad's] . . . cars always . . . [was] absent from the State." *Id.,* at 595.

## I.

Since *Miller* this Court has decided numerous cases touching on the intricate problems of accommodating, under the Due Process and Commerce Clauses, the taxing powers of domiciliary and other States with respect to the instrumentalities of interstate commerce.[5] None of these decisions has weakened the pivotal holding in *Miller*—that a railroad or other taxpayer owning rolling stock cannot avoid the imposition of its domicile's property tax on the full value of its assets merely by proving that some determinable fraction of its property was absent from the State for part of the tax year. This Court has consistently held that the State of domicile retains jurisdic-

---

[4] The Supreme Court of Pennsylvania did find, however, that certain diesel locomotives which had been leased to CNJ by the appellant and which traveled along fixed routes and schedules had acquired a tax situs in New Jersey and could not be taxed at their full value by Pennsylvania. The State has not sought review of this part of that decision.

[5] *E. g., Southern Pac. Co.* v. *Kentucky,* 222 U. S. 63; *Johnson Oil Refining Co.* v. *Oklahoma,* 290 U. S. 158; *Northwest Airlines, Inc.,* v. *Minnesota,* 322 U. S. 292; *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169; *Standard Oil Co.* v. *Peck,* 342 U. S. 382; *Braniff Airways, Inc.,* v. *Nebraska State Board of Equalization,* 347 U. S. 590. See generally Developments, 75 Harv. L. Rev. 953, 979–987.

tion to tax tangible personal property which has "not acquired an actual situs elsewhere." *Johnson Oil Refining Co.* v. *Oklahoma,* 290 U. S. 158, 161.

This is because a State casts no forbidden burden upon interstate commerce by subjecting its own corporations, though they be engaged in interstate transport, to non-discriminatory property taxes. It is only "multiple taxation of interstate operations," *Standard Oil Co.* v. *Peck,* 342 U. S. 382, 385, that offends the Commerce Clause. And obviously multiple taxation is possible only if there exists some jurisdiction, in addition to the domicile of the taxpayer, which may constitutionally impose an ad valorem tax.

Nor does the Due Process Clause confine the domiciliary State's taxing power to such proportion of the value of the property being taxed as is equal to the fraction of the tax year which the property spends within the State's borders. *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, held only that the Due Process Clause prohibited ad valorem taxation by the owner's domicile of tangible personal property *permanently* located in some other State. *Northwest Airlines, Inc.,* v. *Minnesota,* 322 U. S. 292, reaffirmed the principle established by earlier cases that tangible property for which *no* tax situs has been established elsewhere may be taxed to its full value by the owner's domicile. See *New York Central R. Co.* v. *Miller, supra; Southern Pacific Co.* v. *Kentucky,* 222 U. S. 63, 69; *Johnson Oil Refining Co.* v. *Oklahoma, supra.* If such property has had insufficient contact with States other than the owner's domicile to render any one of these jurisdictions a "tax situs," it is surely appropriate to presume that the domicile is the only State affording the "opportunities, benefits, or protection" which due process demands as a prerequisite for taxation. See *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169, 174.

Accordingly, the burden is on the taxpayer who contends that some portion of its total assets are beyond the reach of the taxing power of its domicile to prove that the same property may be similarly taxed in another jurisdiction. Cf. *Dixie Ohio Express Co.* v. *State Revenue Comm'n,* 306 U. S. 72.

The controlling question here is, therefore, the same as it was in *Standard Oil Co.* v. *Peck,* 342 U. S. 382, where the decision whether a state property tax might constitutionally be imposed on the full value of a domiciliary's moving assets turned on whether " 'a defined part of the domiciliary corpus' "—there consisting of boats and barges traveling along inland waters—"could be taxed by the several states on an apportionment basis." 342 U. S., at 384.

Since the burden of proving an exemption is on the taxpayer who claims it, we must consider whether the stipulated facts show that some determinable portion of the value of the appellant's freight cars had acquired a tax situs in a jurisdiction other than Pennsylvania.

## II.

With respect to the freight cars that had been used on the lines of CNJ during the taxable year, the stipulation establishes that they "were run on fixed routes and regular schedules . . . over the lines of CNJ . . . in New Jersey." Their habitual employment within the jurisdiction in this manner would assuredly support New Jersey's imposition of an *apportioned* ad valorem tax on the value of the appellant's fleet of freight cars. *Marye* v. *Baltimore & Ohio R. Co.,* 127 U. S. 117, 123–124; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 23; *Union Refrigerator Transit Co.* v. *Lynch,* 177 U. S. 149; *Johnson Oil Refining Co.* v. *Oklahoma,* 290 U. S. 158, 162–163; cf. *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S.

169; *Braniff Airways, Inc.,* v. *Nebraska Board of Equalization,* 347 U. S. 590, 601. Consequently, the daily average of freight cars located on the CNJ lines in the 1951 tax year, 158 in number, could not constitutionally be included in the computation of this Pennsylvania tax. In this respect, the Pennsylvania Supreme Court's decision (which is difficult to reconcile with its holding as to the similarly situated locomotives, note 4, *supra*) cannot be accepted.

### III.

We conclude, however, that on the record before us Pennsylvania was constitutionally permitted to tax, at full value, the remainder of appellant's fleet of freight cars, including those used by other railroads under the Car Service and Per Diem Agreement of the Association of American Railroads. These were, in the language of the stipulation, "regularly, habitually and/or continuously employed" in this manner, but they did not run "on fixed routes and regular schedules" as did the cars used by CNJ.

Since the domiciliary State is precluded from imposing an ad valorem tax on any property to the extent that it *could* be taxed by another State, not merely on such property as *is* subjected to tax elsewhere, the validity of Pennsylvania's tax must be determined by considering whether the facts in the record disclose a possible tax situs in some other jurisdiction. Had the record shown that appellant's cars traveled through other States along fixed and regular routes, even if it were silent with respect to the length of time spent in each nondomiciliary State, it would doubtless follow that the States through which the regular traffic flowed could impose a property tax measured by some fair apportioning formula. Cf. *Braniff Airways, Inc.,* v. *Nebraska Board of Equalization,* 347 U. S. 590. And this would render unconstitutional any domiciliary ad valorem tax at full value on property that could thus be

taxed elsewhere. *Standard Oil Co.* v. *Peck, supra,* at 384.[6]

Alternatively a nondomiciliary tax situs may be acquired even if the rolling stock does not follow prescribed routes and schedules in its course through the nondomiciliary State. In *American Refrigerator Transit Co.* v. *Hall,* 174 U. S. 70, this Court sustained the constitutionality of a Colorado property tax on a stipulated average number of railroad cars that had been located within the territorial limits of Colorado during the tax year, although it was agreed by the parties that the cars "never were run in said State in fixed numbers nor at regular times, nor as a regular part of particular trains." *Id.,* at 72. Habitual employment within the State of a substantial number of cars, albeit on irregular routes, may constitute sufficient contact to establish a tax situs permitting taxation of the average number of cars so engaged.

On the record before us, however, we find no evidence, except as to the CNJ cars, of either regular routes through *particular* nondomiciliary States or habitual presence, though on irregular missions, in *particular* nondomiciliary States. It is not disputed that many of the railroads listed as owning no track within Pennsylvania do have lines in more than one State, but there is no way of knowing which, if any, of these States may have acquired taxing jurisdiction over some of appellant's freight cars. And

---

[6] The record in *Standard Oil Co.* v. *Peck* discloses that the boats and barges which Ohio sought to tax had been traveling along three regular routes on the Mississippi and Ohio Rivers: from Memphis, Tennessee, to Mt. Vernon, Indiana; from Memphis, Tennessee, to Bromley, Kentucky; and from Baton Rouge or Gibson's Landing, Louisiana, to Bromley, Kentucky. The States in which the vessels landed, as well as those through which they regularly traveled, could undoubtedly have traced these regular trips and levied appropriately apportioned ad valorem taxes.

even with respect to railroads whose lines do not extend beyond the borders of a single State, it cannot be determined whether their use of appellant's cars was habitual or merely sporadic.[7]   It must be obvious that the fraction of a railroad's lines located within Pennsylvania is wholly unilluminating as to the consistency with which that railroad used appellant's cars in some other State.

In short, except as to freight cars traveling on the lines of the CNJ, this record shows only that a determinable number of appellant's cars were employed outside the Commonwealth of Pennsylvania during the relevant tax year.   But as this leaves at large the possibility of their having a nondomiciliary tax situs elsewhere, that showing does not suffice under our cases to exclude Pennsylvania from taxing such cars to their full value.   Neither *Union Refrigerator Transit Co.* v. *Kentucky, supra,* nor *Standard Oil Co.* v. *Peck, supra,* is properly read to the contrary.   In the former, the case was remanded for further proceedings "not inconsistent" with the Court's opinion that the cars in question, "so far as they were [permanently] located and employed in other States," were not subject to the taxing power of the domiciliary State.   199 U. S., at 211.   In the latter, the existence of a tax situs in one or more nondomiciliary States sufficiently appeared from the record.   Note 6, *supra.*   To accept the proposition that a mere general showing of continuous use of movable property outside the domiciliary State is sufficient to exclude the taxing power of

---

[7] The fact that revenues for the use of one or more of appellant's cars were accounted for by a subscriber to the "Car Service and Per Diem Agreement" does not necessarily indicate that such cars were ever used on the lines of that subscriber.   For under the Agreement subscribers were authorized to permit the use of another railroad's cars by nonsubscribers, though they themselves remained liable to the owner railroad for the per diem rentals in respect of their nonsubscriber use.

that State with respect to it, would surely result in an unsound rule; in instances where it was ultimately found that a tax situs existed in no other State such property would escape this kind of taxation entirely.

As we have shown there is nothing to the contrary in *Standard Oil Co.* v. *Peck.* Note 6, *supra.* And neither the *Braniff* nor *Ott* case points to a different conclusion. In *Braniff* the airplanes held subject to nondomiciliary taxation were shown by the record to have flown on fixed and regular routes. 347 U. S., at 600–601. In *Ott* the Court was careful to point out that "the statute 'was intended to cover *and actually covers here,* an average portion of property permanently within the State—and by permanently is meant throughout the taxing year.' " 336 U. S., at 175. (Emphasis added.) In the case before us it is impossible to tell, except as to cars on the lines of the CNJ, what the average number of cars was annually in any given State.

## IV.

Finally, we think that the appellant's equal protection argument is insubstantial and that it was correctly rejected by the Pennsylvania Supreme Court. For purposes of this tax, Pennsylvania could reasonably differentiate between railroads having tracks which lay only within its borders and those whose tracks were located both within and without the State. The various considerations that justify such a classification from a federal constitutional standpoint need hardly be elaborated. It is sufficient to note that the State might reasonably have concluded that the probability of a nondomiciliary apportioned ad valorem tax on a railroad's total assets is greater if the railroad maintains tracks in another State than if it does not. Or it might have determined that the imposition of franchise or other taxes by nondomiciliary States in which the railroad did business compelled some

mitigation of the domiciliary's property tax in order to prevent an oppressive tax burden. In either event, the possible basis for the taxing measure's classification would be reasonable and could not be held to violate the Equal Protection Clause. Cf. *Allied Stores of Ohio, Inc.,* v. *Bowers,* 358 U. S. 522, 526–528; *Stebbins* v. *Riley,* 268 U. S. 137, 142; *Kidd* v. *Alabama,* 188 U. S. 730.

Accordingly, we conclude that with respect to all cars other than those employed by CNJ on its lines in New Jersey the appellant has failed to sustain its burden of proving that a tax situs had been acquired elsewhere. The exemption was properly disallowed in this regard.

The judgment of the Supreme Court of Pennsylvania is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, concurring.

In holding that one State's property tax may be invalidated in part because excessive under the Commerce Clause upon the showing of a risk that some other State could impose a tax on part of the value of the same property, the Court is following principles announced in prior decisions of this Court from which I dissented.[1] While my views expressed in those cases remain un-

---

[1] See, *e. g., Gwin, White & Prince, Inc.,* v. *Henneford,* 305 U. S. 434, 442; *J. D. Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, 316. See also *Northwest Airlines* v. *Minnesota,* 322 U. S. 292, 301 (concurring opinion).

changed, the necessity of this Court's deciding cases requires me to make decisions under the constitutional doctrine there declared so long as the Court remains committed to it.[2]  Where a party seeks to invoke that doctrine, as here, I wholly agree with the Court that the burden of showing that there is a risk of multiple taxation should rest upon the party challenging the constitutionality of a state tax.   I also agree with the Court that the railroad in this case has failed to show a risk of multiple taxation with reference to any cars other than the average number that are in New Jersey on any given day. It is for the foregoing reasons that I concur in the Court's judgment and its opinion insofar as it rests on the Commerce Clause.

Since I think partial invalidation of the tax as to the average number of cars in New Jersey on any given day in the taxable year is fully supported by the Commerce Clause as this Court has interpreted it, I would have been content not to discuss the due process question at all. But since the Court does rest in part on due process, I find it necessary to express my doubts about the use of the Due Process Clause to strike down state tax laws.  The modern use of due process to invalidate state taxes rests on two doctrines: (1) that a State is without "jurisdiction to tax" property beyond its boundaries, and (2) that multiple taxation of the same property by different States is prohibited.  Nothing in the language or the history of the Fourteenth Amendment, however, indicates any intention to establish either of these two doctrines concerning the power of States to tax.   In fact neither of these doctrines originated in the Due Process Clause at all, but were first declared by this Court long before the Fourteenth Amendment with its Due Process Clause was

---

[2] Cf. *Morgan* v. *Virginia,* 328 U. S. 373, 386 (concurring opinion).

adopted in 1868.[3]   And in the first case striking down a
state tax for lack of jurisdiction to tax after the passage
of that Amendment neither the Amendment nor its Due
Process Clause nor any other constitutional provision was
even mentioned; the Court simply struck down the state
tax saying that to sustain it would be "giving effect
to the acts of the legislature of Pennsylvania upon prop-
erty and interests lying beyond her jurisdiction." [4]   These
cases and others that followed for many years after the
adoption of the Amendment rested either on the Com-
merce Clause or on no constitutional provision at all.[5]   In
fact not a single state tax was struck down by this Court
as a violation of the Due Process Clause until 1903 [6]—
35 years after the adoption of the Amendment—and then
wholly without any historical or other reasons to show
why the cryptic words of the Due Process Clause justi-
fied the invalidation of otherwise lawful state taxes.   Nor
did the Court reveal its reasons for giving due process
this meaning in the next case.[7]   Finally, in the third case
applying the Due Process Clause to strike down a state
tax, the Court's complete lack of explanation led Mr.
Justice Holmes to say:

> "It seems to me that the result reached by the court
> probably is a desirable one, but I hardly understand

---

[3] *Hays* v. *Pacific Mail Steamship Co.,* 17 How. 596 (1854).   See
also *The Apollon,* 9 Wheat. 362, 370 (1824) ; *Braniff Airways, Inc.* v.
*Nebraska State Board of Equalization,* 347 U. S. 590, 599 n. 18.

[4] *Railroad Co.* v. *Jackson,* 7 Wall. 262, 268 (1869).

[5] See, *e. g., St. Louis* v. *Ferry Co.,* 11 Wall. 423 (1871) ; *State Tax
on Foreign-Held Bonds,* 15 Wall. 300 (1873); *Morgan* v. *Parham,*
16 Wall. 471 (1873) ; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S.
196 (1885).   See also *Tappan* v. *Merchants' National Bank,* 19 Wall.
490 (1873); *Coe* v. *Errol,* 116 U. S. 517 (1886) ; *Pullman's Palace
Car Co.* v. *Pennsylvania,* 141 U. S. 18 (1891).

[6] *Louisville & Jeffersonville Ferry Co.* v. *Kentucky,* 188 U. S. 385.

[7] *Delaware, Lackawanna & Western R. Co.* v. *Pennsylvania,* 198
U. S. 341 (1905)

how it can be deduced from the Fourteenth Amendment, and as the Chief Justice feels the same difficulty, I think it proper to say that my doubt has not been removed." [8]

The Court has ever since used the Due Process Clause to strike down state laws by finding in it substantially the same protection for interstate commerce as it has found in the Commerce Clause.[9] But there is no reference to commerce in the Fourteenth Amendment and the Court has still never adequately explained just what the basis for

---

[8] *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, 211 (1905). Professor Beale has said of this decision that, "[t]he dissent seemed sound as directed against the opinion that the state had no jurisdiction. Nevertheless, Judge Holmes was equally sound in saying that the result was a desirable one. It would be a rash constitutional lawyer who would argue today that an undesirable result was nevertheless constitutional." 1 Beale, Conflict of Laws, 522. The use of the Due Process Clause as a method of striking down state tax laws remained a source of concern to Mr. Justice Holmes throughout the remainder of his service on the Court and produced quite a number of dissents. See, *e. g., Safe Deposit & Trust Co.* v. *Virginia,* 280 U. S. 83, 96 (1929); *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204, 216 (1930) (overruling *Blackstone* v. *Miller,* 188 U. S. 189); *Baldwin* v. *Missouri,* 281 U. S. 586, 595 (1930). In the *Baldwin* case he stated:

"I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable." 281 U. S., at 595. See also Mr. Justice, later Chief Justice, Stone's dissent in *First National Bank* v. *Maine,* 284 U. S. 312, 331, in which he was joined by Mr. Justice Holmes and Mr. Justice Brandeis and *State Tax Comm'n* v. *Aldrich,* 316 U. S. 174, where the Court overruled *First National Bank* for the reasons expressed by the dissent in that case.

[9] See *H. P. Hood & Sons, Inc.,* v. *Du Mond,* 336 U. S. 525, 562 (dissenting opinion).

its constitutional doctrine is. Because of this I have long entertained many of the same doubts that Mr. Justice Holmes expressed as to the use of this flexible and expansive interpretation of due process to invalidate state tax laws,[10] but since the Court's holding here adequately rests on the presently prevailing interpretation of the Commerce Clause, I do not find this to be an appropriate occasion to suggest reconsideration of the applicability of the Due Process Clause to state tax laws.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting in part.

The stipulations of fact in this case show that an average of 158 freight cars (of the value of $525,765.71) run on fixed routes and regular schedules over railroad lines outside of Pennsylvania. The Court properly holds that they are beyond the constitutional reach of Pennsylvania.

The stipulations of fact also show that an average of 2189.30 freight cars (of the value of $7,282,773) run regularly, habitually, and continuously on the lines of other railroads outside of Pennsylvania, though not on fixed schedules. The Pennsylvania tax on these cars is sustained on the authority of *New York Central R. Co.* v. *Miller,* 202 U. S. 584; and if that case is still intact the Court is correct in denying the exemption claimed.

With all deference we cannot, however, allow Pennsylvania to lay this tax and adhere to our recent decisions. In *Ott* v. *Mississippi Barge Line,* 336 U. S. 169, we allowed Louisiana and the City of New Orleans to levy ad valorem taxes on barges of foreign corporations even though the barges were not permanently in those jurisdictions nor operated there on fixed routes and regular schedules. The assessments sustained were "based on the ratio

---

[10] See, *e. g., Treichler* v. *Wisconsin,* 338 U. S. 251, 257 (dissenting opinion); *Thomas* v. *Virginia,* 364 U. S. 443 (dissenting opinion).

between the total number of miles of appellees' lines in Louisiana and the total number of miles of the entire line." *Id.*, at 171. We adopted for barge lines the rule applicable to railroads, saying that we saw "no practical difference so far as either the Due Process Clause or the Commerce Clause is concerned whether it is vessels or railroad cars that are moving in interstate commerce." *Id.*, at 174. We went on to say:

"The problem under the Commerce Clause is to determine 'what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.' *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 365. So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. See *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444. Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State." *Ibid.*

We applied the decision in *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18, to barges, even though the *Pullman's Car* case, as noted in the *Miller* case (202 U. S., at 597), sustained a tax on capital stock where the "same cars were continuously receiving the protection" of the nondomiciliary taxing State. Nonetheless, in the *Ott* decision we allowed the tax by the nondomiciliary State to be levied on "an average portion of property permanently within the State." 336 U. S., at 175.

In *Standard Oil Co.* v. *Peck,* 342 U. S. 382, we completed the redefinition of the holding in the *Miller* decision which was implicit in what we wrote in *Ott.* In the *Peck* case the domiciliary State was held to have no power to tax barges, except on a formula "which fairly apportioned the tax to the commerce carried on within the state" (*id.*,

at 383), as a result of which "inland water transportation" was placed "on the same constitutional footing as other interstate enterprises." *Id.*, at 384. We distinguished the *Miller* case by saying that there "it did not appear that 'any specific cars or any average of cars' was so continuously in another state as to be taxable there." *Id.*, at 384. And we went on to say:

> "No one vessel may have been continuously in another state during the taxable year. But we do know that most, if not all, of them were operating in other waters and therefore under *Ott* v. *Mississippi Barge Line Co.*, *supra*, could be taxed by the several states on an apportionment basis. The rule which permits taxation by two or more states on an apportionment basis precludes taxation of all of the property by the state of the domicile. See *Union Transit Co.* v. *Kentucky*, 199 U. S. 194. Otherwise there would be multiple taxation of interstate operations and the tax would have no relation to the opportunities, benefits, or protection which the taxing state gives those operations." *Id.*, at 384–385.

In *Braniff Airways* v. *Nebraska Board*, 347 U. S. 590, we allowed a nondomiciliary State to levy an apportioned ad valorem tax on aircraft making 18 stops per day in that State. We said, "We think such regular contact is sufficient to establish Nebraska's power to tax even though the same aircraft do not land every day and even though none of the aircraft is continuously within the state." *Id.*, at 601.

As a result of the *Ott, Peck* and *Braniff* cases the average of 2189.30 freight cars that run regularly, habitually, and continuously on lines of other railroads outside Pennsylvania could be taxed by other States, even though no State can identify the precise cars within its borders and even though the complement of cars is constantly

changing. Since that average of freight cars is regularly, habitually, and continuously outside Pennsylvania, those cars are taxable elsewhere and thus beyond Pennsylvania's reach. The fact that we do not know the average annual number of cars in any given State does not help Pennsylvania's case. Whatever the average in any one State, the total outside Pennsylvania and taxable elsewhere is known and definite. Since that is true, we sanction double taxation when we sustain this tax. We would not allow it in the case of any other interstate business; and, as I read the Constitution, no exception is made that puts the railroad business at a disadvantage.