THOMPSON, Judge.
Gulf Caribe Maritime, Inc., a corporation organized under the laws of the State of Washington, with its principal place of business located in Mobile, Alabama, appeals to this court[1] from a judgment of the Probate Court of Mobile County denying its petition for a refund of ad valorem taxes. Gulf Caribe contends that it is entitled to a refund of the amount of ad valorem taxes it paid for the tax years 1997 and 1998.
Alabama levies a personal property ad valorem tax on numerous items of personal property. Section 40 — 11—1 (b)(3), Ala.Code 1975, provides that the subjects of ad valo-rem taxation include
“[a]ll steamboats, barges, vessels, and watercraft of every name and kind however propelled, plying waters of this state, and the owners thereof shall return same for taxation to the assessors in the county wherein he resides; and, if such steamboat, barge, vessel, or watercraft is owned by a corporation, then in that county where its principal office is located; in the case of the owner’s being an individual not residing in this state or being a corporation with no principal office in this state, then in the county or counties where used; all such steamboats, barges, vessels, or watercraft whether owned by a resident or nonresident of this state, which have acquired a permanent situs in this state. Ml transfer boats, steamboats, or barges used by any railroad in transferring cars and passengers must be assessed and taxed in the county or counties where used, or where the owner resides, regardless of where such vessel may be registered.”
In the tax years 1997 and 1998, Gulf Car-ibe paid ad valorem taxes on the full value of the “Caribe Pioneer,” a 110-foot tugboat, and the “Chem Caribe,” a 274-foot barge. On September 16, 1999, Gulf Car-ibe petitioned the Probate Court of Mobile County for a refund of the ad valorem taxes it had paid. See § 40-10-160, Aa. Code 1975. In its petition for refund Gulf Caribe claims that, had the Mobile County Revenue Department correctly appor *251 tioned the ad valorem taxes in 1997 and 1998 for the tugboat and the barge, it would be due a substantial tax refund. The Revenue Commissioner responded, stating that the exemption Gulf Caribe sought was not authorized by the Alabama statute.
The probate court conducted an eviden-tiary hearing and the parties submitted briefs. On May 10, 2000, the probate court entered a judgment denying Gulf Caribe’s petition for refund. Gulf Caribe filed a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P., and the probate court held a hearing on that motion. On July 19, 2000, the probate court denied the postjudgment motion and Gulf Caribe appealed.
The facts are basically undisputed. Gulf Caribe pays ad valorem taxes to Mobile County on personal property, including the tugboat and barge at issue in this appeal. The tugboat and barge are owned by Gulf Caribe and leased to Chemex Corporation, a company with facilities located both in Ponce, Puerto Rico, and Mobile, Alabama. Chemex leases docks for the vessels’ use in Puerto Rico. Gulf Caribe owns no property in Puerto Rico. The vessels spend their time almost exclusively traveling between the two ports. Chemex pays Gulf Caribe a daily rate per voyage for the vessels to transport railcars containing chemicals from Mobile to Ponce; on the return trip they transport empty railcars and hazardous waste bound for Kansas, Missouri, North Carolina, and South Carolina.
On each trip, the vessels follow basically the same route. In Mobile, they begin their voyage at the Alabama State Docks and travel down the Mobile ship channel or the Mobile River and past the territorial waters of Alabama. The vessels continue across the Gulf of Mexico to the Straits of Florida; from there it travels through the Atlantic Ocean, north of Cuba and the Dominican Republic; through the Mona Passage; and then through Puerto Rican territorial waters to Ponce, Puerto Rico, which is located on the southern side of that island. The tugboat and barge do not travel in any canals or bays or other inland waters of Puerto Rico. During 1997 and 1998,[2] the vessels made approximately 18 round-trips between Mobile and Ponce each year. During those trips the vessels remained in Ponce for an average of two days per trip. According to Gulf Caribe’s calculations, the vessels were in Puerto Rico for approximately 10% of the year in each of these two years and were in Alabama between 22% and 32% of each of these tax years. The rest of the time these vessels were in international waters.
During the time the vessels were docked in Ponce, the Gulf Caribe personnel on board spent most of their time servicing and repairing the vessels, and loading and discharging railcars transported on the vessels. In addition, at one point during the two years Gulf Caribe paid to repair a dock with which one of the vessels had collided.
Gulf Caribe conducts its business through its office in Alabama. All employees, including the crew members for the vessels, are hired through the Alabama office; federal and state taxes are paid through the Alabama office. All maintenance on the vessels is done in Alabama and all repairs, except those of an emergency nature, are made in Alabama. Over 90% of supplies purchased for the vessels are purchased in Alabama; when the vessels dock in Ponce, a Gulf Caribe employee telephones Alabama to arrange for supplies to be ordered and ready, awaiting the return of the vessels.
*252 Where the facts of a case are undisputed and the trial court is called upon to determine a question of law, no presumption of correctness attaches to the trial court’s determination and this court’s review is de novo. Monroe v. Valhalla Cemetery Co., 749 So.2d 470 (Ala.Civ.App.1999).
In its brief, Gulf Caribe asserts that the probate court erred in affirming the Mobile County Revenue Commissioner’s denial of its petition for refund, because, it argues, the ad valorem tax imposed on the full value of the barge and the tugboat, i.e., — not apportioned to take into account the time the vessels are outside Alabama — violated the Commerce Clause of the United States Constitution. Gulf Caribe cites Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), in support of its contention. Gulf Caribe also contends that in its judgment the trial court relied upon the “home-port doctrine” [3] as opposed to the “apportionment doctrine” and contends that the “home-port doctrine” has been abandoned since Japan Line was decided. Gulf Caribe contends that the probate court erred in affirming the denial of its petition for refund because, it says, the ad valorem tax imposed on its vessels was not fairly apportioned to reflect the time the vessels spent in Puerto Rico. In its judgment, the probate court found Gulf Caribe had. failed to present authority to support its contention that the Commerce Clause and the Due Process Clause require a domiciliary state (in this case, Alabama) to apportion property taxes assessed against vessels that, although travel in international waters, travel the inland waters of only the domiciliary state. The probate court declared that without such authority, Gulf Caribe cannot establish its right to the exemption. Quoting Central Railroad Co. of Pennsylvania v. Pennsylvania, 370 U.S. 607, 612, 82 S.Ct. 1297, 8 L.Ed.2d 720 (1962), the court held that the rule was well established that “tangible property for which no tax situs has been established elsewhere may be taxed at its full value by the owner’s domicile.” In its judgment, the probate court noted that only 5% of the total mileage of the vessels represented travel in Puerto Rico and that the vessels spent less than 10% of their time in Puerto Rico in each of these tax years. According to the Central Railroad court, a tax situs in a nondomiciliary state may be established in one of two ways: 1) the taxpayer may establish that its property moved through that state in a fixed and regular route; or 2) the taxpayer must prove that some of its property was habitually employed in the state in substantial numbers over irregular routes. Id. The trial court stated that Gulf Caribe has failed to meet either test.
Gulf Caribe does not claim that it falls within a tax exemption; it acknowledges that it owes a tax. Gulf Caribe asserts that because the ad valorem tax is not fairly apportioned to reflect the time the vessels were actually located in Alabama the tax violates the Commerce Clause of the United States Constitution. The Commerce Clause grants Congress the exclusive power to regulate commerce with foreign nations and among the states. The clause does not, however, abrogate each state’s power to tax for the support of its own government. Boston Stock Exchange v. State Tax Comm’n, 429 U.S. 318, *253 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). In 1977, the United States Supreme Court adopted a four-part test for determining whether a state tax imposed on interstate commerce will survive a Commerce Clause challenge. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Such a tax is constitutional if it “is applied to an activity with substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided.” Id. at 279, 97 S.Ct. 1076. The Supreme Court’s subsequent decision in Japan Line, supra, reinforced the constitutional restriction placed upon the states by the Commerce Clause. The Japan Line Court struck down California’s imposition of an ad valo-rem tax on cargo containers owned by a foreign entity and used exclusively in international commerce but fully taxed in the domiciliary country. The court in Japan Line identified two factors (in addition to those enumerated in Complete Auto Transit) a comb must consider in determining whether a tax unduly burdens interstate commerce: the risk of multiple taxation and the potential impairment of our nation’s ability to speak with “one voice.” Id. at 446-49, 97 S.Ct. 1076. The Japan Line Court held that application of the tax to instrumentalities of foreign commerce resulted in multiple taxation and interfered with federal uniformity; thus, it violated the Commerce Clause. Id. at 451-54, 99 S.Ct. 1813.
Four years after the Supreme Court handed down Japan Line, it limited its holding in that case by the opinion in Container Corp. of America v. Franchise Tax Board., 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). In Container Corp., the state of California had required Container Corporation to include all foreign subsidiary income as part of its “unitary” business income. Container Corporation complained that the inclusion of the foreign subsidiary income in California’s apportionment tax scheme violated the guidelines set forth in Japan Line, because the income of the foreign subsidiaries had already been taxed in the countries in which those subsidiaries were located on an unapportioned basis. The Container Corp. Court held that, despite the resulting double taxation, the circumstances presented by Container Corp. were easily distinguishable from Japan Line for a number of reasons, including 1) the tax challenged by Container Corporation was an income tax and not a tax on property; 2) the double taxation, although real, was not inevitable under the California taxing scheme; and 3) the tax fell on a domestic corporation, not a foreign owner of an instrumentality of foreign commerce. The Court in Container Corp., also clarified and relaxed the second prong of the test set forth in Japan Line — that a state taxing scheme should not prevent the Federal Government from speaking with one voice. The Container Corp. Court restated that test as “whether a state tax implicates foreign policy or violates a clear federal directive.” 463 U.S. at 194, 103 S.Ct. 2933. Further, as pointed out by the United States Supreme Court in Barclays Bank PLC v. Franchise Tax Board of California, 512 U.S. 298, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994), the Japan Line Court expressly left open the question whether Japan Line had any application to “ ‘domestically owned instrumentalities engaged in foreign commerce.’ ” Barclays, 512 U.S. at 334, 114 S.Ct. 2268 (O’Connor, J., concurring in part and concurring in the judgment and quoting Japan Line, 441 U.S. at 444 n. 7, 99 S.Ct. 1813).
As a matter of due process, the domiciliary state has jurisdiction to tax the personal property of its own corporations unless some portion of the property has *254 acquired a taxable situs elsewhere. Central Railroad, 370 U.S. at 611-12, 82 S.Ct. 1297. The question whether an instrumentality of commerce has acquired a tax situs in another state is purely a question of due process. Braniff Airways, Inc. v. Nebraska State Bd. of Equalization & Assessment, 347 U.S. 590, 599, 74 S.Ct. 757, 98 L.Ed. 967 (1954).
The Texas Court of Appeals addressed an issue similar to the one presented here in Jet Fleet Corp. v. Dallas County Appraisal District, 773 S.W.2d 744 (Tex.Ct.App.1989). In Jet Fleet, the corporate taxpayer challenged a tax on the full value of its aircraft as violating the Commerce Clause and the Due Process Clause of the United States Constitution. The taxpayer was both domiciled and had its principal place of business in Texas. The taxpayer also had office space and terminal space in New Jersey and Louisiana. The taxpayer engaged only in charter flights and its aircraft were not located outside of the state more than 20% of the year. Applying the test set forth in Complete Auto, the Jet Fleet court upheld the tax. The Jet Fleet court pointed out that the taxpayer’s charter service was based in Texas and that most of its operations emanated from Dallas County, Texas; it concluded, therefore, that the taxpayer had a substantial nexus with the taxing state. Id. Secondly, the Jet Fleet court held that the tax was not discriminatory because the state statute in question applied the tax to all personal property located in Texas for longer than a temporary period, or located out of Texas temporarily while its owner remained in the state, or used in the state continually, whether regularly or irregularly. The final prong of the Complete Auto test required the Jet Fleet court to determine whether the taxpayer had acquired a taxable situs in another jurisdiction. The Jet Fleet court concluded that the taxpayer had not, noting that the record included no evidence pertaining to the specific amount of time the planes remained in nondomieiliary states, the activities performed in those states, or whether those states had provided the taxpayer with services, benefits, or protections.
The Mississippi Supreme Court also considered a similar set of facts in a case where an unapportioned ad valorem tax was imposed on trucks leased from an Alabama corporation and tagged in Alabama, but stored in Mississippi. Fifty percent of the mileage of the trucks was within the state. See Thomas Truck Lease, Inc. v. Lee County, 768 So.2d 870 (Miss.1999). The Thomas Truck case cited Northwest Airlines, Inc. v. State of Minnesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 (1944), as authority for its position that it possessed the authority to impose an ad valorem tax on property domiciled within the state, whether or not that property was involved in interstate commerce. The Mississippi Supreme Court decided Thomas Truck in 1999, and, in that decision, appeared to adopt the home-port doctrine. The United States Supreme Court denied certiorari review in that case. The Mississippi Supreme Court reasoned that even assuming, arguendo, the Commerce Clause required a constitutional analysis of the ad valorem tax, the tax would pass constitutional muster. The Thomas Truck court went on to address the appellant’s apportionment challenge to the tax. In defining “apportionment,” that court explained that the central purpose behind the apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction. The court explained that there was no single apportionment formula that has been approved. Instead, the court explained, citing Goldberg v. Sweet, 488 U.S. 252, 260-62, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989), the inquiry when determining whether a *255 tax was fairly apportioned was whether the tax was internally and externally consistent. To determine whether a tax is internally consistent, the court must be assured that if every state imposed an identical tax no multiple taxation would occur. To determine whether a tax is externally consistent, the court must be assured that the state has taxed only that portion of the revenues from the interstate activity that reasonably reflects the “instate” component of the activity being taxed. Thomas Truck, 768 So.2d at 876. The court declared the tax to be internally consistent, reasoning that no multiple taxation would occur if other states imposed an identical tax. The Thomas Truck court also determined that the tax was externally consistent, i.e., that it taxed only that portion of the revenues from interstate activity that reasonably reflects the instate component. 768 So.2d at 877. In Thomas Tmck the court noted that the tax was levied against only 30% of the value of the vehicles and that the vehicles traveled 50% of their- miles in the state; the court, therefore, concluded that the tax reasonably reflected the in-state activity of the vehicles.
Alabama law is sparse on the subject; there have been no recent cases addressing the state’s power to tax personal property involved in interstate commerce. In 1893, our supreme court decided National Dredging Co. v. State, 99 Ala. 462, 12 So. 720 (1893), in which it considered the proper tax situs for certain dredging equipment owned by a Delaware corporation; the equipment had been used continuously in a large project in Mobile Bay for the preceding two years. The National Dredging Court concluded that the dredging equipment had become so enmeshed with tangible property in Alabama for revenue purposes, that its taxable situs was in Alabama rather than in Delaware, its domiciliary state. In 1939, the Alabama Supreme Court cited National Dredging with approval, finding that a tax situs was not established for property in a certain location temporarily, but that it could be established by a showing that the property would be in Alabama for such an indefinite period as to connote permanency. Tennessee Coal, Iron & R.R. v. State, 239 Ala. 19, 193 So. 143 (1939). We have found no other Alabama cases since 1939 (and the appellant’s brief does not refer us to any) addressing the issue of the taxable situs of movable personal property. In 1994, in addressing a constitutional challenge to the Alabama use tax, our supreme court held: “Exemptions from taxation are to be strictly construed against the person or party claiming the exemption and in favor of the right to tax.” Ex parte Fleming Foods of Alabama, Inc., 648 So.2d 577, 578-79 (Ala.1994).
Turning to the facts presented by Gulf Caribe in its appeal, we note that the domiciliary state is entitled to tax the full value of a taxpayer’s tangible personal property for which no other tax situs has been established. Central R.R., 370 U.S. at 612, 82 S.Ct. 1297. A mere showing of the continuous use of tangible movable property in other jurisdictions is insufficient to exclude the taxing power of the domiciliary state. Ott v. Mississippi Barge Line Co., 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585 (1949). Gulf Caribe had the burden of proving that it has established a tax situs elsewhere than Alabama. Central R.R., 370 U.S. at 613, 82 S.Ct. 1297.; Ex parte Fleming, supra. The domiciliary state may require its own corporations to pay nondiscriminatory property taxes even though those corporations are involved in interstate commerce; the Commerce Clause is violated only through multiple taxation of the same interstate operations. Central R.R., 370 U.S. at 612, 82 S.Ct. 1297; Standard Oil Co. v. Peck, 342 U.S. *256 382, 72 S.Ct. 309, 96 L.Ed. 427 (1952). It is quite obvious that no risk of multiple taxation exists unless there is some jurisdiction, in addition to the domiciliary state, in which a tax situs has been established. The Central Railroad Court provided a two-pronged test to be applied to determine whether a tax situs had been established in a nondomiciliary jurisdiction. 370 U.S. at 613, 82 S.Ct. 1297. That Court provided that a tax situs is acquired if (a) the vehicles (or vessels) are operated along fixed and regular routes and on regular schedules, or (b) the vehicles (or vessels) are habitually employed in the nondomicili-ary state in large numbers. 370 U.S. at 614-15, 82 S.Ct. 1297. Finally, when an apportionment tax is imposed by a nondo-miciliary jurisdiction it must be just and equitable. American Refrigerator Transit Co. v. Hall, 174 U.S. 70, 19 S.Ct. 599, 43 L.Ed. 899 (1899). In addition, such a tax must be reasonably related to the opportunities, benefits, and protections afforded by the taxing jurisdiction. Ott v. Mississippi Barge Line, supra. Moreover, those opportunities, benefits, and protections must be available throughout the year. Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 (1944).
Applying these principles to the facts as shown by the record, we conclude that Gulf Caribe has failed to prove that it established a tax situs in Puerto Rico. The voyages made by the vessels were not fixed and regularly scheduled; these vessels were chartered on an “as needed basis” to transport railcars containing chemicals to Puerto Rico and return empty railcars and hazardous waste to Alabama. See Jet Fleet Corp., supra; cf. Braniff Airways v. Nebraska State Bd. of Equalization & Assessment, supra (Court upheld apportionment on the basis that Braniff was a commercial airline that transported freight and passengers to nondomiciliary jurisdictions 18 times each day on a fixed and regular schedule). The scheduling of the trips was based both upon the needs of Chemex, the customer that leased the vessels, and upon the maintenance requirements of the vessels, instead of a regular schedule. It is clearly established that Gulf Caribe failed to meet the second prong of the test established by Central Railroad; its vessels did not habitually occupy the ports of Puerto Rico in substantial numbers. There is -no evidence to support a finding that vessels owned by Gulf Caribe habitually occupied ports in Puerto Rico in substantial numbers. The tugboat and the barge were the only Gulf Carribe-owned vessels that traveled to Puerto Rico. When those vessels departed the port at Ponce, Puerto Rico, there was no arriving vessel to take their place. We therefore conclude that Gulf Caribe failed to present sufficient evidence to establish that it had a tax situs in Puerto Rico; therefore, Alabama, the domiciliary state, is entitled to assess the vessels for ad valorem tax purposes at their full value. Gulf Caribe has conceded that Puerto Rico has made no attempt to tax the vessels and in the final analysis it does not appear that a nondomiciliary apportionment tax imposed by Puerto Rico would be just and equitable under the circumstances. The record reflects that all maintenance, except emergency repairs, was performed in Mobile Bay. All Gulf Caribe employees, including the captains, mates,-and deckhands for the vessels in question, were hired in Mobile. Income taxes, payroll taxes, and health insurance premiums were paid in Alabama through Gulf Caribe’s Mobile office. Ninety percent of the supplies used on the vessels were purchased in Alabama, and Gulf Caribe personnel typically telephoned Alabama from Puerto Rico to arrange to have supplies purchased and available for *257 them upon the return of the vessels. We agree with the conclusion reached in the judgment of the probate court, which provided:
“Here, the Caribe Pioneer and Chem Caribe are present in Puerto Rico only to load and unload their cargo. Only 5% of their mileage was traveled in Puerto Rico, and less than 10% of their time in either year was spent there. The fact that Gulf Caribe spends money on emergency repairs, or on the occasional medical treatment of a sick crew member, or that employees of Gulf Caribe attend occasional meetings in Puerto Rico does not make Puerto Rico anything other than a port of convenience.... ”
When the evidence is considered as a whole, it becomes clear that Alabama, as the domiciliary state, provided the vessels with the opportunities, benefits, and protection the due process clause requires as a prerequisite to taxation. Gulf Caribe’s asserted need for apportionment to avoid a potential double taxation has no factual basis. The record reflects that the majority of the time the vessels spend during the tax year is spent on ocean waters and Gulf Caribe’s requested apportionment would allow it to escape altogether approximately 75% of the ad valorem tax on the vessels.
Because Gulf Caribe failed to carry its burden of establishing a tax situs in Puerto Rico, the judgment of the probate court is affirmed.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY, J., concurs in the result.
MURDOCK, J., dissents.

. Gulf Caribe's appeal is properly before this court because an appeal from a petition seeking a refund of ad valorem taxes filed pursuant to § 40-10-160, Ala.Code 1975, is not one of the seven designated actions listed in § 12-22-21, Ala.Code 1975, that can be appealed from the probate court to the circuit court or the Alabama Supreme Court. SC Realty v. Jefferson County, 638 So.2d 1343 (Ala.Civ.App.1993). Further, this court has exclusive jurisdiction of appeals from administrative agencies. § 12-3-10, Ala.Code 1975; See also, Kimberly-Clark Corp. v. Eagerton, 433 So.2d 452 (Ala.1993).

. 1997 and 1998 are the two years in which a partial refund is being sought.

. Pursuant to the "home-port doctrine," the vessels could only be taxed at the domicile of their owner, unless the vessel becomes so completely incorporated with the personal property of a nondomiciliary state that it loses its situs at the home porl. See Hays v. Pacific Mail S.S. Co., 58 U.S. 596, 17 How. 596, 15 L.Ed. 254 (1855).