**Dr. Lani FORD, et al.**

v.

**Chancellor Roy S. NICKS, et al.**

No. 77–3202.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 9, 1988.

Charles Hampton White, Cornelius and Collins, Nashville, Tenn., for plaintiffs.

Christine Modisher and Mary E. Walker, Asst. Attys. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This action was commenced on April 26, 1977, by Lani Ford and William Clark Ford to remedy alleged employment discrimination against them by the Board of Regents of the State University and Community College System of Tennessee, its individual members, its member institution, Middle Tennessee State University (hereinafter "MTSU"), and the president of MTSU,

M.G. Scarlett, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* This cause of action was originally tried by this Court without a jury on January 14–15, 1981. On May 11, 1982, the Court entered a Memorandum and Order in which it found that both plaintiffs had been the victims of unlawful discrimination. In an opinion dated August 23, 1984, the Sixth Circuit affirmed the Court's decision regarding Clark Ford's claim, but reversed the decision regarding Lani Ford's claim and remanded her case. 741 F.2d 858. Lani Ford's case was retried by the Court without a jury on January 23 and 27, 1986. In this Memorandum, the Court makes a redetermination of the merits of Lani Ford's claims of employment discrimination. Lani Ford alleges that she was denied reappointment as a professor on the faculty of MTSU at the end of the 1971–72 academic year because of her sex. Defendants contend that there was a legitimate, non-discriminatory reason for their decision to not rehire Lani Ford, and they deny any discriminatory intent. The Court, having reviewed the pleadings, the exhibits, the testimony of witnesses, the statements of counsel, and the entire record in this cause, makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

In March of 1970, Clark Ford was completing the requirements for a Ph.D. degree in business education at Michigan State University. Similarly, Lani Ford, Clark Ford's wife, was completing the requirements for a Ph.D. degree in secondary education at the same institution, although she was not scheduled to receive her degree until the end of the 1970–71 school year, a year after her husband was scheduled to receive his terminal degree. On March 13, 1970, Elwin W. Midgett, Chairman of the Department of Business Education and Office Management at MTSU, telephoned Clark Ford and stated that he had heard that Ford and Ford's wife were looking for positions at an institution where both could teach and that MTSU had openings available for both. Midgett told Clark Ford that MTSU was especially inter-

ested in obtaining his services because the university wished to institute a program leading to the conferral of a Master of Business Education degree.

On April 20, 1970, Clark Ford traveled to MTSU to discuss the possibility of employment for Lani and himself with Midgett, Dr. Howard Kirksey, Vice President for Academic Affairs, and Dr. Delmer Pockat, Dean of the College of Education. During this visit, Clark Ford executed an employment contract in which he agreed to work as an associate professor in the Department of Business Education for the 1970–71 school year. Clark Ford also spoke with the above persons regarding opportunities for Lani Ford in the Department of Education. Dean Pockat informed Clark Ford that Lani Ford would be considered for the next job in the Department of Education and Library Science for which she was qualified. In May of 1970, Midgett wrote Clark Ford and advised him:

I have not given up as yet on finding a position for Lani. Best bet here is in sociology as they are trying to fill four positions. I talked to the Dean of the school a few minutes and sent her resume down to him.

The Fords moved to Murfreesboro, Tennessee, the location of MTSU, in the summer of 1970. Lani Ford visited the MTSU campus and again spoke to Dr. Ralph White, Chairman of the Department of Education and Library Science, concerning the possibility of obtaining a position in that department. White responded that he could not employ her because she did not have her terminal degree. Shortly thereafter, in October of 1970, Clark Ford spoke with White concerning whether Lani Ford might be hired upon receipt by her of a Ph.D. degree in secondary education. White advised Clark Ford that he did not wish to hire any wives or husbands of other faculty members.

In December of 1970, after Lani Ford had completed all of the course requirements leading to the conferral of a Ph.D. degree in secondary education from Michigan State, she again contacted Dean Pockat regarding the possibility of employ-

ment opportunities for her. Pockat told her that if she were employed, she would be restricted in rank and salary because her husband was already on the faculty. Lani Ford also spoke again with Dr. White, who informed her that a part-time job was available as a special teacher, but that the job would not provide faculty rank, tenure, or salary commensurate with that received by other faculty members possessing the same academic credentials. After learning that the opening actually was for a clerical employee, Lani Ford rejected this offer of employment.

After these conversations had transpired between Lani Ford, White, and Dean Pockat during the month of December, Midgett reviewed with Clark Ford his first year's performance. In a memorandum entitled "Review of New Staff Members—Dr. William Clark Ford," Midgett observed:

Dr. Ford is understandably concerned at the discrimination against man and wife teams as he thinks this is a hinderance to professional development. This concerns me also very greatly since this has been a way of life at this institution for many years and the institution would have been a much poorer one had we had such a policy in the past. I don't believe that this is a university wide policy but it is at the departmental level. For a dean to tell Dr. Ford that if his wife were to be employed at this institution that she might be restricted in rank, salary, and tenure is, of course, discouraging and may cause us to lose the services of Dr. Ford in the Business and Office Education Department.

. . . .

Dr. Ford has already made a distinct contribution to this Department and we're expecting him to continue to do so. . . . I recommend that every effort be made to retain his services, as it would be a distinct loss for us to lose him. Since his wife is so thoroughly prepared for college teaching, it is hoped that a satisfactory position can be found for her; unless, of course, the university itself has a stated policy against man and wife teams teaching in the same institution.

On March 5, 1971, Clark Ford sent a letter to M.G. Scarlett, President of MTSU, in which he outlined the steps that he and Lani Ford had taken to find employment for Lani Ford at MTSU. He also described the restrictive statements made by members of the MTSU administration to the Fords regarding the circumstances and status of Lani Ford if she ever became a member of the faculty. Scarlett did not respond to this letter. However, the plaintiffs did meet with Scarlett in the summer of 1971 to discuss employment on the faculty for Lani Ford. After speaking with other officials in the MTSU administration concerning the availability of resources to employ Lani Ford, Scarlett became aware of the existence of monies from a Peabody grant that could be used to fund a position for her for one year. These funds, however, were known as soft money and would not be available on a permanent basis. On August 17, 1971, MTSU tendered Lani Ford a contract of employment as assistant professor in the Department of Education and Library Science for the 1971–72 school year at a salary of $11,000. When Lani Ford accepted this position on September 1, 1971, she held a Ph.D. degree in secondary education. The contract read, in part: "This is a contract for the 1971–72 academic year only. Funds for this appointment are from an external source rather than the official university budget and, therefore, there is no commitment expressly or implied that there be continuance beyond this contract."

During the 1971–72 school year, MTSU required students in the Department of Education and Library Science seeking certification as teachers to take a number of required courses. Lani Ford was qualified and competent to teach all of them. White discussed with Lani Ford her preferences for class assignments and subjects during the fall of 1971 and assigned her to teach "Psychological Learning and Development," "Evaluation and Guidance;" and a graduate level course entitled "Evaluation and Guidance." Lani Ford's classwork during the first semester of the 1971–72 year involved teaching sophomores, juniors

and graduate students. White evaluated her work and stated that it was satisfactory and well done. In the second semester, White assigned Lani Ford to supervise student teachers and, again, she performed these duties in a satisfactory manner. Nevertheless, in an evaluation of Lani Ford on January 26, 1972, White concluded that he would be "reluctant to acquire additional staff in her area of specialization on anything other than a part-time or temporary basis." Prior to the end of the second semester of the 1971–72 school year, Dr. John Trufant resigned as a member of the faculty of the Department of Education and Library Science. Trufant had occupied a regular faculty teaching position and had taught both undergraduate and graduate courses, many of which Lani Ford was qualified to teach. Lani Ford completed the 1971–72 school year, but was not reappointed.

In the summer of 1972, plaintiffs endeavored to obtain a new teaching position for Lani Ford. In early August of 1972, before classes for the 1972–73 school year began, Lani Ford learned that a second professor, Dr. John Wagner, had resigned on August 8, 1972, as a professor in the Department of Education and Library Science. For several years prior to his resignation, Wagner had taught required courses in the department and also had supervised student teachers. Lani Ford attempted to contact White by telephone after she learned of Wagner's resignation, but White declined to return her phone calls. On August 11, 1982, Lani Ford forwarded a written request to President Scarlett requesting that she should be assigned to the position vacated by Wagner. In a telephone conversation with Scarlett shortly after her August 11, 1972, letter, Lani Ford was told by Scarlett that all of the open positions in the Department of Education and Library Science had been filled by eight new professors or instructors, seven of whom were male, and one of whom, Douglas Knox, did not hold a doctorate degree. On September 13, 1972, Scarlett informed Lani Ford in a letter that he could find "no reasonable basis for intervention on my part" to review White's

decision not to recommend her to fill openings in the Department of Education and Library Science for the 1972–73 school year.

During the 1972–73 school year, Douglas H. Knox, the new assistant professor in the Department of Education and Library Science, taught four freshman courses during the first semester, and supervised student teachers during the second semester. Like Lani Ford, Knox was compensated through a Peabody grant. MTSU reappointed Knox at the end of the 1972–73 year. Although Knox obtained an Ed.D. degree from the University of Southern Mississippi in May, 1973, his only teaching experience in the classroom had been as an instructor of geography for two years at Morehead State University in Morehead, Kentucky.

During the period from the academic year 1971–72 through the year 1976–77, Lani Ford was the only professor employed at MTSU who was not reappointed at the end of her first year of teaching. In the 1971–72 year, although there were approximately 34 or 35 male faculty members in the Department of Education and Library Science, there were only approximately six or seven female members of the department.

In the school year 1970–71, ten new faculty members were hired in the Department of Education and Library Science. Of those ten faculty members, only two were female, Juana Burton and Shirley Fischer. Fischer resigned at the end of that year. Burton, whose specialty was higher education, was not renewed at the end of the spring of 1976, having never obtained tenure. In 1971–72, six new faculty members were hired in the Department of Education and Library Science, only one of whom was a woman, Lani Ford. Lani Ford's employment ended in the spring of 1972 when she was not reappointed. In 1972–73, eight new faculty members were hired in the Department of Education and Library Science. Of these new faculty members, only one was female, Helen Self. Self retired in 1981 never having obtained tenure. Thus, during this three-year period, 24 new faculty members

were hired. Four of these were female, and none of the four ever obtained tenure. Of the 20 male faculty members hired during this period, only two left the faculty as a result of nonrenewal of their teaching contracts. Of the remaining 18 male faculty members, those who remained on the faculty for six years all obtained tenure.

White testified that Lani Ford did not meet the needs of the Department of Education and Library Science due to the department's anticipated growth in graduate areas of specialty. However, through the 1976-77 school year, the department did not experience any significant decline in the sophomore, junior, and senior levels of undergraduate enrollment. Indeed, by the 1974-75 school year, the department had experienced a significant increase in the junior and senior levels of undergraduate enrollment.

Douglas Knox' salary was paid in 1972-73 from the same source of funds as Lani Ford's salary had been paid in 1971-72. White testified that Knox was hired because of his specialty in the area of higher education. However, during the fall semester of 1972, Knox taught five sections of "Personal Adjustment," Course 111; and in the spring semester of 1973, he taught two sections of Course 111 and taught Course 411 A and B, "Supervision of Student Teaching." It is undisputed that Lani Ford was qualified to teach these courses and, in fact, had taught Course 411 A and B during her year on the faculty. Robert Eaker, who also was hired in 1972-73, spent the entire year teaching courses that Lani Ford had taught in 1971-72. George Glover, who was hired in 1972-73, taught Course 411 A and B in the fall of 1972, and taught five sections of Course 111 in the spring of 1973. Again, these were courses that Lani Ford unquestionably was qualified to teach. In the 1973-74 school year, Glover again taught Course 411 A and B in both semesters. William Kaltsounis, who was hired in 1972-73, spent the 1972-73 year teaching courses that Lani Ford had taught in 1971-72. Of the ten classes taught by Kaltsounis in the 1973-74 school year, eight were in courses Lani Ford had taught in 1971-72. Of 12 classes taught by Kaltsounis in the 1974-75 school year, nine were in courses that Lani Ford had taught during the 1971-72 school year.

In the 1972-73 school year, James Austin, Charles Babb, Robert McCrummen, Gerald Bauman, Robert Eaker, George Glover, William Kaltsounis, Douglas Knox, Donald Lau, Helen Self, and William String all taught courses that Lani Ford either had taught or was qualified to teach. Eaker, Glover, Kaltsounis, and Knox taught only courses that Lani Ford either had taught or was qualified to teach during the 1972-73 school year. Yet, Lani Ford was refused employment during the 1972-73 school year, while Eaker, Glover, Kaltsounis, and Knox were hired for that year because of the department's professed need for professors with specialty areas possessed by these men.

A number of new courses were added to the graduate catalog for the Department of Education and Library Science between 1969 and 1975. White, however, admitted that there was no guarantee that all of these courses would be taught and acknowledged that no faculty member was qualified to teach all of these courses. During the years 1971-72 and 1972-73, when White stated that he was required to absorb Lani Ford into the faculty and that he was searching for faculty members with specialized degrees, a number of new graduate courses were added to the Department of Education and Library Science curriculum. Knox was not qualified to teach any of these courses. Certain core courses were required for any degree in the department and it is undisputed that Lani Ford was qualified to teach virtually all of the required core courses.

During the spring semester of 1972, Lani Ford supervised student teachers. A number of the student teachers supervised by Lani Ford were in the elementary setting, a field in which White testified Ford was not qualified to teach. White, however, admitted that Lani Ford's work during the 1971-72 school year was satisfactory. In 1983-84, during her period of reinstatement after this Court's initial decision, Ford's per-

formance again was rated as satisfactory. She was awarded an increase in salary, together with a merit increase. In addition, Lani Ford was selected by White in 1984 to participate in making a recommendation on a textbook for graduate course 663. Although President Scarlett and White stated that it was unusual to hire a teacher who could teach only undergraduate courses, Lani Ford was qualified to teach graduate as well as undergraduate courses.

In a document entitled "A Self Study of Middle Tennessee State University 1972–73," prepared by committees of the faculty for the Southern Association for Colleges and Schools, the following findings of the W–Committee of the university's American Association of University Professors (AAUP) chapter were included in the report:

1. Women do not tend to be hired as readily as men at the higher ranks.
2. Women teachers stay longer than men in a rank before being promoted.
3. Women tend to be less well represented in the higher ranks.
4. Women/Men salary discrepancies tend to exist to the greatest extent at the assistant professor rank.
5. Women hired recently are paid better in relation to men than those hired in earlier years.
6. Women rarely move into supervisory positions such as department heads.

Dr. Robert Corlew, Vice President for Academic Affairs at MTSU, was the consultant to the committee that prepared this portion of the self-study. In addition, Corlew was a member of the university AAUP chapter that provided these conclusions for the self-study.

## II. CONCLUSIONS OF LAW

Plaintiff alleges discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The objectives of this provision are clearly delineated in 42 U.S.C. § 2000e–2(a)(1) and (2), which make it unlawful:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,. sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Two judicial theories have been articulated by the Supreme Court to effectuate these objectives. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court enunciated the disparate treatment theory, and in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court articulated the disparate impact theory. Either theory may be applied to a particular set of facts. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Thus, the theories merely present alternative foundations upon which a court may base liability. Plaintiffs' claims are founded on the disparate treatment theory recognized in *McDonnell Douglas.*

*McDonnell Douglas* clearly delineates the allocation of the burden of proof in Title VII disparate treatment cases. First, plaintiff must establish a prima facie case of discrimination by showing:

(1) that he or she is a member of a protected class;

(2) that he or she applied for and was qualified for a job for which the employer was seeking applicants;

(3) that despite his or her qualifications, he or she was rejected; and

(4) that, after his or her rejection, the employer filled the position with another person who was not a member of the plaintiff's protected class.

411 U.S. at 802, 93 S.Ct. at 1824. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Due to factual distinctions among cases, the Supreme Court has acknowledged that not all of these elements may be applicable to every case. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Thus, the *McDonnell Douglas* prima facie model of discrimination has been modified to apply not only when the plaintiff alleges discriminatory failure to hire, but also when the plaintiff alleges discriminatory failure to promote, *Burdine*, 450 U.S. at 248, 101 S.Ct. at 1089, discriminatory retaliation, *Harris v. Richards Manufacturing Co.*, 511 F.Supp. 1193, 1201 (W.D. Tenn.1981), *affirmed in part, reversed in part*, 675 F.2d 811 (6th Cir.1982), discriminatory constructive demotion, *see Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982), and retaliatory dismissal, *Morvay v. Maghielse Tool Co.*, 708 F.2d 229, 233 (6th Cir.), *cert. denied*, 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983).

Second, if the plaintiff proves a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment practice. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant successfully meets this burden if it "raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The defendant is not required to convince the court that the actual source of its motivation was the proffered reasons. *Id.* The plaintiff's "prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; ... the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1096.

Third, if the defendant satisfies its burden, the plaintiff must demonstrate that the defendant's "proffered reason was not the true reason for the employment decision." *Id.* at 256, 101 S.Ct. at 1095. Re-stated, the plaintiff must show that the defendant's proffered justification is pretextual and unworthy of credence. *Id.* at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The plaintiff may prove pretext either directly or indirectly. Direct proof of pretext consists of the plaintiff persuading the court that, despite the defendant's proffered explanation, it was motivated by a discriminatory animus. Indirect proof actually occurs throughout the trial by the plaintiff showing that the defendant's explanation is not credible or is unworthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

During the pretext stage, the trial judge evaluates all the evidence and theories in order to determine which explanation of the challenged employment action it believes. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). Although the presumption of discrimination is considered successfully rebutted by the defendant at this stage, that rebuttal does not mean that the court cannot consider previously admitted evidence. Evidence presented in the plaintiff's case-in-chief as well as that offered by the defendant remains relevant. The Supreme Court acknowledged this procedural predicament when it noted that:

> In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

*Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. Thus, the pretext stage is a

critical point in the Title VII trial not only because the issues are sharpened, but also because the trial court is considering all the evidence in order to determine whether purposeful discrimination has been proven.

As in all other civil litigation, the ultimate burden in Title VII cases of proving by a preponderance of the evidence the existence of discrimination in a challenged employment practice of the defendant is on the plaintiff. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482. "[A]lthough the burdens of production may shift between the plaintiff and the defendant, the burden of persuasion remains with the plaintiff at all times.... Because the burden of *producing* is much lighter than the burden of *persuading,* most Title VII disparate treatment cases are decided on the pretext issue." *Burton v. State of Ohio, Adult Parole Authority,* 798 F.2d 164, 166 (6th Cir.1986). In making these determinations of whether there is a violation presented by the testimony, the court should consider "reasonable inferences drawn from the totality of facts, the conglomerate of activities, and the entire web of circumstances presented by the evidence on the record as a whole." *Jeffries v. Harris County Action Association,* 425 F.Supp. 1208, 1216 (S.D.Tex.1977), *vacated on other grounds,* 615 F.2d 1025 (5th Cir.1980). *Accord EEOC v. St. Joseph Paper Co.,* 557 F.Supp. 435, 439 (W.D. Tenn.1983).

In the instant case, plaintiff Lani Ford alleges that she was denied reappointment as a professor on the faculty of MTSU at the end of the 1971–72 academic year because of her sex. To make out a prima facie case as to this claim, plaintiff must satisfy each of the four elements articulated in *McDonnell Douglas.* The Court concludes that plaintiff has met her initial burden. First, she is a woman, and gender is a protected classification. Second, she applied for and was qualified to teach at the college level in a number of areas in the field of education for which instructors were needed at the time in question. Third, despite her qualifications, plaintiff's application was rejected. Finally, defendants hired a number of male professors in the Department of Education and Library Science at the time in question.

Having determined that plaintiff has made out a prima facie case, the Court now must consider defendants' claims that legitimate justifications exist for not hiring plaintiff. MTSU has advanced two reasons for its failure to reappoint Lani Ford at the end of the 1971–72 school year: (1) lack of funds; and (2) Lani Ford's lack of qualifications commensurate with the goals and objectives of the Department of Education and Library Science.

■ With respect to the first claim that the university lacked adequate funds, Douglas Knox, one of the seven new male faculty members hired by the university for the 1972–73 academic year, was paid from the same outside grant that had funded Lani Ford's employment the previous year. The evidence, therefore, shows that funding continued to be available to pay the salary of a male whom the university hired instead of Lani Ford and who continued to be employed for several years as a member of the faculty. Contrary to the assertions made by Scarlett, White and Pockat on behalf of the university, there was no proper or legitimate reason for the failure of the university to reappoint Lani Ford that can be grounded upon any consideration of funds or finances.

■ With respect to the second claim, that Lani Ford lacked qualifications commensurate with the goals and objectives of the Department of Education and Library Science, the Court finds that defendants have articulated a legitimate justification for not reappointing Lani Ford. The proof revealed that the Department of Education and Library Science added eleven new graduate degree programs between 1967 and 1976 and that the department was seeking faculty members who could teach in existing graduate programs or offer graduate courses in developing graduate programs. The Court recognizes that selecting faculty involves an evaluation of a number of subjective as well as objective factors. As a result, the Court concludes that defendants have articulated a legitimate justification for not rehiring Lani Ford.

The Court now must consider whether Lani Ford has carried her burden of proving that this justification is pretextual. The Court concludes that plaintiff has met this burden and that defendant unlawfully discriminated against her because of her sex.

MTSU appointed Lani Ford to the faculty after she had received a Ph.D degree in the area of secondary school education of students. She had served three and one-half years as a classroom teacher at public schools in Oregon, Michigan and Alaska. The Department of Education and Library Science requires its students who seek teacher certification to study a required number of courses in the department, all of which Lani Ford was qualified to teach. Students in the department also must undergo actual training in front of students in the classroom, and Ford also was competent and qualified to supervise this aspect of the program of educating teachers. On the other hand, Douglas Knox, whom MTSU hired eleven days after Lani Ford requested appointment to the vacancy created by the resignation of John Wagner, did not hold a terminal degree and did not possess teaching experience that was superior to that of Lani Ford prior to his appointment. In addition, Knox's assignment during the first semester of the 1972–73 school year was to teach freshman courses exclusively, whereas Ford, during her first semester, had taught sophomore, junior and graduate courses in a satisfactory manner. Further, Lani Ford's experience as a teacher in a secondary school classroom certainly was more noteworthy than the teaching experience that Knox enjoyed prior to his appointment, which consisted of two years of experience as an instructor of geography at the college level.

Although White has stated that he was forced "to absorb" Lani Ford as a member of the faculty of the Department of Education and Library Science, both Dean Pockat and President Scarlett have contradicted his testimony with respect to the alleged duress or compulsion with which Lani Ford was employed by the department. Both Pockat and Scarlett have asserted that at MTSU during the period of time pertinent to this lawsuit, the chairman of each department of the university possessed the freedom and authority to hire or fire new academic personnel. Although White has asserted that he needed a faculty with advanced training in reading, media communications, aerospace, special education and administration and supervision, he assigned Knox to teach required freshman courses during Knox's first semester and to supervise student teachers during his second semester. In any event, White's insistence that he was forced to absorb Lani Ford and that she was unqualified, unspecialized, or unable to accommodate the particular needs of the department is not buttressed by the advanced classroom assignments that he gave her. Moreover, the admission by White that Lani Ford taught all of the courses assigned to her in a satisfactory manner contradicts any assertion that she may have been unqualified for a teaching load. At the same time, the number of new academic personnel hired by the department to handle the duties and teaching loads required of the department during the decade of the 1970s shows that there is no basis upon which to assume that no job was offered to Lani Ford simply because, due to allegedly declining enrollments, no students would have been available in the 1972–73 academic year. Finally, the failure to offer Lani Ford the position from which John Wagner resigned dictates the pretextual nature of White's reasons for not reappointing Ford. Wagner taught a freshman course, and supervised student teachers, the same teaching assignment that White bestowed upon Knox immediately after his appointment.

The Court FINDS that MTSU's failure to reappoint Lani Ford at the end of the 1972–73 school year was the result of sex discrimination practiced against her in violation of 42 U.S.C. § 2000e–2. But for sex discrimination, which the Court finds was a determinative factor in defendants' decision not to rehire her, Lani Ford would have continued in her employment with the university.

### III. RELIEF

■ The Court now considers the relief to which plaintiff is entitled. It first considers whether reinstatement is appropriate

in this case. The Court is mindful of the undesirability of overturning the judgment of professional educators with respect to the decisions made by them in hiring other professionals. However, White himself judged the performance of Lani Ford as a member of the faculty of MTSU and testified on behalf of the university that she performed satisfactorily and without complaint during the 1971–72 academic year. In addition, despite the testimony of Dr. Charles W. Myers that Lani Ford could not teach satisfactorily in the department unless she had kept pace with developing trends in education, and despite the defendants' attempts to show that Ford had not kept pace with those trends, Ford performed satisfactorily during her initial reinstatement in the 1983–84 academic year. Furthermore, during that year, she served on a committee formed to select a textbook for a graduate level course in the department. As a result, in following the path between excessive intervention in the affairs of the university and an unwarranted tolerance of unlawful behavior, the Court concludes that it would be appropriate for the Board of Regents of the State University and Community College System of Tennessee, acting to supervise the personnel affairs of MTSU as one of its member institutions, to reinstate the plaintiff as a member of the MTSU faculty, with full salary and the appropriate benefits, seniority and tenure status that she would have been afforded had she been employed continuously from the end of the 1971–72 year, at which time she was not re-hired, to the present. As the Sixth Circuit has recognized, under Tennessee Law existing at the times pertinent to this case, any professor in a state university who successfully completed five years of employment at the university was automatically granted tenure. Such a remedy affords plaintiff the employment opportunity that was denied to her in violation of Title VII. The fact that the discrimination in this case took place in an academic rather than a commercial setting does not permit the Court to abdicate its responsibility to insure the award of a meaningful remedy. To the contrary, the Court must not shirk from discharging the responsibilities entrusted to it by Congress pursuant to Title VII.

The Board of Regents of the State University and Community College System of Tennessee, acting to supervise the personnel affairs of its member institution, MTSU, shall immediately and forthwith appoint Lani Ford as a member of the faculty of the Department of Youth Education and School Personnel Services at the University, this appointment to be made by the Board of Regents with full salary and the appropriate benefits, seniority and tenure status that MTSU would have afforded her had she been continuously employed on the faculty from the end of that academic year in which she failed to be hired to the present.

In addition, plaintiff is entitled to backpay to compensate her for wages lost as a result of the discriminatory conduct involved in this case. 42 U.S.C. § 2000e–5(g). Absent discrimination, plaintiff would have earned substantially more as a professor at MTSU than she has in real estate. However, the backpay otherwise allowable is to be reduced by interim earnings or amounts earnable with reasonable diligence by the plaintiff. The record contains evidence of the amounts that have been earned by plaintiff from 1980 to the beginning of the first academic year at MTSU in which she failed to be reappointed to employment at that institution, and the defendants have failed to carry the burden of going forward with evidence demonstrating that plaintiff has failed to exercise the reasonable diligence from which a determination might have been made that other or further funds were earnable. Instead, the testimony of plaintiff established that she has endeavored, when permitted by family circumstances to do so, to obtain employment in various institutions of higher learning.

The Board of Regents of the State University and Community College System of Tennessee and its member institution, MTSU, shall pay backpay to Lani Ford to be computed from the date of entry of this judgment to the date of the beginning of the first academic year of Middle Tennessee State University in which the plaintiff failed to be hired, after deduction of the wages, salaries and real estate commissions that have been earned by plaintiff throughout such period of time. Instead of

being entitled to any award of pre-judgment interest, plaintiff shall benefit by being paid each automatic increase in salary, together with increase on increase, which has been set forth in the applicable schedules mandated by the Tennessee General Assembly and the Board of Regents during the foregoing time period.

Defendants, within ten (10) days, shall prepare and submit to the Court a computation setting forth the amounts they contend are due to plaintiff in backpay pursuant to the conclusions reached in this case with respect to plaintiff's monetary relief, and plaintiff, within ten (10) days of receipt of defendants' submission, shall prepare and submit to the Court a computation setting forth the amounts to which she feels she is entitled in backpay.

An award to plaintiff of costs and attorney's fees also is appropriate in this case. Section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), provides that "(i)n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." An individual prevailing as a plaintiff in an employment discrimination suit "ordinarily is to be awarded attorney's fees in all but special circumstances." *Copeland v. Martinez*, 603 F.2d 981, 985 (D.C.Cir.1979). Plaintiff has prevailed in this action, and there are no special circumstances present here that preclude her from an award of attorney's fees to be taxed as part of the costs of this proceedings. Finally, the defendants, the Board of Regents and its member institution, MTSU, are not immune from an award of attorney's fees under 42 U.S.C. § 2000e–5(k) as a result of any ground relating to the Eleventh Amendment to the Constitution of the United States. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457, 96 S.Ct. 2666, 2672, 49 L.Ed.2d 614 (1976). Accordingly, the Court concludes that a reasonable attorney's fee will be included within the costs of this action and will be assessed against the Board of Regents of the Tennessee University and Community College System. Plaintiff shall submit an accounting of attorney's fees within ten (10) days of entry of this Memorandum.

## IV. SUMMARY

Plaintiff in this action, Lani Ford, claims that defendants discriminated against her because of her gender in the terms and conditions of her employment at MTSU. Discrimination on the basis of sex is prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* This Memorandum details the Court's findings of fact and conclusions of law.

The Court FINDS that plaintiff was the victim of intentional discrimination because of her sex. Accordingly, the Court ORDERS that plaintiff be reinstated to her position as a member of the MTSU faculty, that plaintiff be provided with the full seniority and tenure status that she would have received but for defendants' illegal discriminatory acts, that plaintiff be awarded backpay, costs, and attorney's fees, which sums the Court shall determine at a later date, and that defendants engage in no further acts of discrimination or retaliation against plaintiff.

An Order will be entered simultaneously with this Memorandum.