**FIRST AIRCRAFT LEASING, LTD., Appellant,**

v.

**BEXAR APPRAISAL DISTRICT, Appellee.**

No. 04–00–00320–CV.

Court of Appeals of Texas, San Antonio.

Jan. 24, 2001.

---

Joseph M. Harrison IV, Brusniak, Clement, Harrison & McCool, Robert J. Myers, Robert J. Myers & Associates, San Antonio, for Appellant.

Dale Wilson, Law Office of Dale Wilson, P.C., San Antonio, for Appellee.

Sitting: TOM RICKHOFF, Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

TOM RICKHOFF, Justice.

This is an appeal from a judgment in favor of appellee, Bexar Appraisal District

("BAD"), in which the trial court determined that an aircraft owned by appellant, First Aircraft Leasing, Ltd. ("First Aircraft"), was subject to ad valorem taxation in Bexar County, Texas, for the 1996 tax year. The threshold issue in this appeal is whether the trial court erred by not applying Texas Tax Code section 21.05 to the aircraft. Because we hold that the aircraft falls within the scope of Section 21.05, we reverse and remand.

### BACKGROUND

The parties stipulated to the following facts. First Aircraft's principal place of business is located in San Antonio, Bexar County, Texas. First Aircraft, which is not a "certified air carrier,"[1] owns and leases a Fairchild SA227 AC (Metro III) aircraft. From February 1992 to March 1995, First Aircraft leased the Metro III to Conquest Airlines Corp., which is a "certified air carrier." From June 1995 to September 1995, First Aircraft leased the Metro III to Peninsula Airways, Inc., which is a "certified air carrier." From September 27, 1995 to December 24, 1996, the Metro III was "between leases," and in storage being repaired, inspected, and maintained. During this time period, the aircraft was held by First Aircraft and available for lease.

From September 1995 to May 1996, the Metro III was physically located at San Antonio International Airport. From May 1996 to December 20, 1996, the aircraft was located in San Marcos, Texas. In December 1996, First Aircraft leased the Metro III to Merlin Express, Inc., which is a "certified air carrier." On December 20,

1996, the aircraft was returned to San Antonio International Airport, where it was maintained until Merlin Express relocated the aircraft on April 4, 1997. Although the lease was executed in December 1996, Merlin Express did not place the aircraft into service until April 1997.

At no time between September 27, 1995 and April 4, 1997 did the Metro III leave Texas airspace. No other taxing jurisdiction of any state other than Texas has sought to impose a property tax on the Metro III and no foreign country has attempted to tax the aircraft for 1996. The parties agreed that if the aircraft was taxable in Texas for the 1996 tax year, it was taxable in Bexar County.

The trial court determined the Metro III was subject to ad valorem taxation in Bexar County, Texas, for the 1996 tax year.[2] This appeal by First Aircraft ensued.

### WHEN AN AIRCRAFT IS A "COMMERCIAL AIRCRAFT"

First Aircraft argues that the Metro III was not subject to taxation by BAD on January 1, 1996 because it was eligible for an exemption under Section 21.05(c) and the aircraft was a "commercial aircraft" as defined in Section 21.05(e). BAD counters that the Metro III was subject to taxation on January 1, 1996 because it was not a "commercial aircraft" on that date and the aircraft did not constitute an instrumentality of interstate commerce on that date.

■■■ BAD's argument relies on Tax Code sections 11.42(a),[3] 21.01,[4] and

---

1. A "certified air carrier" is "one engaged in interstate or intrastate commerce under authority of the U.S. Department of Transportation." TEX.PROP.TAX CODE ANN. § 21.05(e)(3) (Vernon 1992).

2. The trial court also determined the aircraft was not subject to ad valorem taxation in Bexar County, Texas, for the tax year 1997. BAD does not appeal this determination.

3. Eligibility for and the amount of an exemption available under Chapter 11 of the Tax

21.02(a)[5] for the proposition that a snapshot must be taken on a single day (January 1) and the aircraft's status *on that date alone* determines whether Section 21.05 applies. This argument is contrary to the rules of statutory construction[6] and the clear language of the Tax Code.

Chapter 11 of the Tax Code specifies when Texas has jurisdiction to tax real and personal property, and contains certain exemptions from taxation. Under Section 11.01, all tangible personal property that Texas has jurisdiction to tax is taxable unless exempt by law. TEX.PROP.TAX CODE ANN. § 11.01(a) (Vernon 1992). Texas has jurisdiction to tax tangible personal property if the property is (1) located in Texas for longer than a temporary period; (2) temporarily located outside Texas and the owner resides in Texas; or (3) used continually, whether regularly or irregularly, in Texas. *Id.* § 11.01(c). Tangible personal property that is operated or located exclusively outside Texas during the year preceding the tax year and on January 1 of the tax year is not taxable in Texas. *Id.* § 11.01(d).

Chapter 21 contains various appraisal and assessment provisions and methods by which the taxable situs of property is determined. Tangible personal property is taxable by a particular taxing unit, such as BAD, if

(1) it is located in the unit on January 1 for more than a temporary period;

(2) it normally is located in the unit, even though it is outside the unit on January 1, if it is outside the unit only temporarily;

(3) it normally is returned to the unit between uses elsewhere and is not located in any one place for more than a temporary period; or

(4) the owner resides (for property not used for business purposes) or maintains his principal place of business in this state (for property used for business purposes) in the unit and the property is taxable in this state but does not have a taxable situs pursuant to Subdivisions (1) through (3) of this section.

*Id.* § 21.02(a).

We conclude that Sections 11.01(c) and 21.02(a) provide, as a general rule, that jurisdiction to tax exists based on the length of time property is located in the taxing unit within Texas. *See Pratt & Whitney Canada, Inc. v. McLennan County Appraisal Dist.*, 927 S.W.2d 641, 643 (Tex.App.—Waco 1996, writ denied) (the corollary to Section 11.01(c)(1) is that, if property is not located in the state for "longer than a temporary period," the state does not have jurisdiction to tax). An exception to Section 21.02 is found in Section 21.05. *Id.* § 21.02(a). Section 21.05 provides the method by which as-

---

Code for any tax year are determined by a claimant's qualifications on January 1. TEX. PROP.TAX CODE ANN. § 11.42(a) (Vernon Supp. 2000).

**4.** With one exception not applicable here, "[r]eal property is taxable by a taxing unit if located in the unit on January 1." *Id.* § 21.01.

**5.** With certain exceptions, "tangible personal property is taxable by a taxing unit if ... it is located in the unit on January 1 for more than a temporary period...." *Id.* § 21.02(a)(1).

**6.** Our obligation to enforce the plain language does not authorize us to employ a "bloodless literalism in which text is viewed as if it had no context." *West Anderson Plaza v. Feyznia*, 876 S.W.2d 528, 532 (Tex.App.—Austin 1994, no writ). Instead, we must consider the context and the consequences that would follow from a particular interpretation. *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex.1991). We must avoid interpretations that would produce absurd results or render other language mere surplusage. *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998); *Sharp*, 815 S.W.2d at 249.

sessment and situs are determined for "commercial aircraft." "Commercial aircraft" are taxable to the extent provided in Section 21.05(a)[7] and (b).[8] The taxable situs of a "commercial aircraft" is determined under Section 21.05(c)[9] and (d).[10]

We interpret Section 21.05 as raising two questions. First, is the aircraft a "commercial aircraft" as defined in subsection (e).[11] Second, is the aircraft located in Texas for "longer than a temporary period" as determined under subsection (c). The answer to the first question is determined by examining the use made of the aircraft.

■ BAD's snap-shot argument would take an aircraft out of Section

21.05's scope if the company that owned the aircraft leased it to a certified air carrier every day of the year, except on January 1. This is an absurd result not contemplated by the legislature. Instead, we agree with First Aircraft that an aircraft's status as "commercial" is determined by looking back in time to the aircraft's use in the year preceding January 1 of the applicable tax year. Determining the status of personal property based on the property's use over the preceding tax year is consistent with Chapter 21, which provides methods of appraisal, assessment, and allocation that take into consideration the use of the subject property. *See* Tex. Prop.Tax Code Ann. § 21.021 *et seq.*[12] This is also consistent with Section 21.05 as read in its entirety.[13] Section 21.05(b) pro-

7. "If a commercial aircraft that is taxable by a taxing unit is used both in this state and outside this state, the appraisal office shall allocate to this state the portion of the fair market value of the aircraft that fairly reflects its use in this state. The appraisal office shall not allocate to this state the portion of the total market value of the aircraft that fairly reflects its use beyond the boundaries of this state." Tex.Prop.Tax Code Ann. § 21.05(a).

8. "The allocable portion of the total fair market value of a commercial aircraft that is taxable in this state is presumed to be the fair market value of the aircraft multiplied by a fraction, the numerator of which is the product of 1.5 and the number of revenue departures by the aircraft from Texas during the year preceding the tax year, and the denominator of which is the greater of (1) 8,760, or (2) the numerator." *Id.* at § 21.05(b).

9. "During the time in which any commercial aircraft is removed from air transportation service for repair, storage, or inspection, such aircraft is presumed to be in interstate, international, or foreign commerce and not located in this state for longer than a temporary period for purposes of Section 11.01 of this code." *Id* . at § 21.05(c).

10. "A certificated air carrier shall designate the tax situs of commercial aircraft that land in Texas as either the carrier's principal office in Texas or that Texas airport from which the

carrier has the highest number of Texas departures." *Id.* at § 21.05(d).

11. "For purposes of this subchapter, a commercial aircraft shall mean an instrumentality of air commerce that is: (1) primarily engaged in the transportation of cargo, passengers, or equipment for others for consideration; (2) economically employed when it is moving from point to point as a means of transportation; and (3) operated by a certificated air carrier. A certificated air carrier is one engaged in interstate or intrastate commerce under authority of the U.S. Department of Transportation." *Id.* § 21.05(e).

12. *See id.* §§ 21.021 (taxation based on use of vessels and other watercraft); 21.03 (allocation of total market value of personal property used continually outside of Texas); 21.031 (allocation of taxable value of vessels and other watercraft used outside Texas); 21.04 (allocation of total market value of railroad rolling stock); 21.05 (taxation and allocation of commercial aircraft based on use); 21.06 (taxation of intangible personal property based on residence of owner and use); 21.07 ( taxation of intangibles of certain transportation businesses); and 21.08 (determination of situs of intangibles of certain financial institutions).

13. In construing a statute, we must attempt to give effect to every word and phrase if it is

vides that "[t]he allocable portion of the total fair market value of a commercial aircraft that is taxable in this state is presumed to be the fair market value of the aircraft multiplied by a fraction, the numerator of which is the product of 1.5 and the number of revenue departures by the aircraft from Texas *during the year preceding the tax year ....*" *Id.* § 21.05(b) (emphasis added).

■ If the allocable fair market value of an aircraft is determined by its use over the preceding tax year for purposes of subsection (b), then the aircraft's character as "commercial" must be determined by its use over the preceding tax year for purposes of subsection (e). Therefore, if an aircraft, during the year preceding the applicable tax year, was primarily engaged in the transportation of cargo, passengers, or equipment for others for consideration; was economically employed when it was moving from point to point as a means of transportation; and was operated [14] by a certificated air carrier, then the aircraft qualifies as a "commercial aircraft."

The parties stipulated that the Metro III was "between leases" from September 27, 1995 to December 24, 1996, and was held by First Aircraft as available for lease during that time. The parties also stipulated that while the aircraft was "between leases" and/or not being actively flown, it was in storage, subject to various repairs, inspections, and periodic maintenance. The aircraft's storage during this time period does not disqualify it from being char-acterized as "commercial" to the extent the aircraft qualifies as "commercial" under Section 21.05(e) during the period of January 1, 1995 to September 26, 1995.

## CONSTITUTIONALITY OF SECTION 21.05

■ BAD asserts that applying Section 21.05(c) to the Metro III would violate article VIII, sections 1 and 2, of the Texas Constitution because it would exempt property without a constitutional basis. BAD's argument begins with the premise that such a holding would transform Section 21.05 into an exemption statute. BAD asserts, and First Aircraft does not dispute, that no other jurisdiction has imposed a tax on the Metro III for 1996 and it is unlikely any other state has a sufficient nexus with the aircraft to acquire a taxable situs for 1996. BAD contends Texas has jurisdiction to tax the Metro III based on First Aircraft's corporate domicile and the physical location of the aircraft on January 1, 1996. BAD concludes that there is no overriding federal principle that dictates the Metro III be exempt from taxation. A similar argument was rejected by the Texas Supreme Court in *Appraisal Review Board of Galveston County v. Tex–Air Helicopters, Inc.*, 970 S.W.2d 530 (Tex.1998).

In *Tex–Air*, the Texas taxing authorities refused to allocate the fair market value of helicopters used to transport personnel and supplies to offshore oil and gas platforms and ships in the Gulf of Mexico.

---

reasonable to do so. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex.1998); *see also* TEX.GOV'T CODE ANN. § 311.021(2) (Vernon 1998) (stating that in enacting a statute, it is presumed that the entire statute is intended to be effective).

**14.** We note that the legislature designated "commercial aircraft" as those "operated" by certificated air carriers. If the legislature had intended Section 21.05 to apply only to aircraft *owned* by certified air carriers, it would have used the word "owned" rather than the word "operated" in subsection (e)(3). The choice of the word "operated" instead of "owned" indicates the legislative intent that Section 21.05 apply to entities, such as First Aircraft, which own aircraft that they in turn lease to certified air carriers.

The taxing authorities argued that Section 21.05 was unconstitutional as applied because it allowed part of the helicopters' value to go untaxed by any jurisdiction. *Id.* at 532. The taxing authorities asserted that Tex–Air's admission that it had not paid taxes to another state or nation or otherwise subjected its property for taxation in another jurisdiction conclusively established that Section 21.05 was a de facto tax exemption. Tex–Air asserted that it had established a tax situs in Louisiana and therefore the United States Constitution required an allocation such as provided by Section 21.05(a).

The Supreme Court rejected the taxing authorities' argument, noting that the United States Constitution forbids a state from taxing more than its fair share of property regardless of whether it actually results in double taxation. *Id.* at 534. " 'Since the domiciliary State is precluded from imposing an ad valorem tax on any property to the extent that it *could* be taxed by another State, not merely on such property as *is* subjected to tax elsewhere, the validity of [the domiciliary state's] tax must be determined by considering whether the facts in the record disclose a possible tax situs in some other jurisdiction.' " *Id.* at 534–35 (citing *Central RR Co. v. Pennsylvania,* 370 U.S. 607, 614, 82 S.Ct. 1297, 8 L.Ed.2d 720 (1962)) (emphasis in original).

The Supreme Court observed that it had interpreted the Texas Constitution to incorporate the common law doctrine expressed by the maxim *mobilia sequuntur personam* ("movables follow the person"), by which personal property is taxable in full at the domicile of the owner regardless of the property's actual location. *Id.* at 533. The Court noted that this rule had evolved in Texas to allow taxation of personalty at the domicile of the owner unless (1) tangible personal property has acquired a tax situs of its own away from the domicile, or (2) a statute directs otherwise. *Id.* The Court concluded that the allocation under Section 21.05(a) was not an unauthorized exemption but an attempt to comply with United States constitutional mandates. *Id.* The Supreme Court discussed those mandates as follows:

> The United States Constitution limits Texas' power to tax property which has acquired a tax situs outside of the State. A tax on instrumentalities of commerce raises two constitutional concerns. First, due process requires at least a minimal jurisdictional connection with a state. The due process limitation on taxing instrumentalities of commerce demands that the tax in practical operation bear some relation to opportunities, benefits, or protection conferred or afforded by the taxing state. The second constitutional issue is whether a tax represents a burden on interstate commerce. The concern here is with the potential for double taxation if every state is free to tax the property at full value.

*Id.* at 533 (citations omitted).

Although the issue in *Tex–Air* was whether Section 21.05(a) was an exemption, and here the issue, as phrased by BAD, is whether Section 21.05(c) is an exemption, we find the reasoning in *Tex–Air* instructive. Read as a whole, Section 21.05 does not provide for an exemption. Instead, subsections (a) and (b) provide the method for allocating to Texas the portion of a commercial aircraft's fair market value that fairly reflects its use in Texas. *Tex–Air,* 970 S.W.2d at 532; TEX.PROP.TAX CODE ANN. § 21.05(a), (b). Subsections (c) and (d) provide the method for determining the aircraft's taxable situs. *Id.* § 21.05(c), (d). None of these subsections, read separately or together, results in an unconstitutional exemption. BAD has not met its burden of showing that Section

21.05, as applied to the Metro III, is unconstitutional.

## CONCLUSION

We hold that BAD may tax the Metro III for the 1996 tax year to the extent allowed by the provisions of Tax Code section 21.05, if First Aircraft establishes that the aircraft was used as a "commercial aircraft" in 1995. We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.