# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 16, 2010 Session

## TECO BARGE LINE, INC. , N/K/A U. S. UNITED BARGE LINE, LLC  v. JUSTIN P. WILSON, TENNESSEE COMPTROLLER OF THE TREASURY, ET AL.

**Appeal from the Tennessee State Board of Equalization**
**Assessment Appeals Commission**
**Kelsie Jones, Executive Secretary**

---

**No. M2009-01675-COA-R12-CV - Filed July 9, 2010**

---

Taxpayer, an interstate water transportation carrier company operating boats and barges over various waterways including the Mississippi and Tennessee Rivers, was assessed an ad valorem tax on personal property for the tax year 2005.  Taxpayer appealed the assessment to the State Board of Equalization.  Following the filing of Taxpayer's appeal, Taxpayer was retroactively assessed for the two tax years immediately preceding the original assessment, 2003 and 2004.  Taxpayer appealed these assessments as well as assessments in subsequent tax years 2006, 2007 and 2008.  A hearing was held before an Administrative Law Judge, who upheld both the regular as well as the retroactive assessments.  Taxpayer appealed to the State Board of Equalization Assessment Appeals Commission and, following a hearing, the Commission affirmed the ALJ's decision.  Taxpayer appeals; we affirm in part and reverse in part.

**Tenn. R. App. P. 12 Direct Review of Administrative Proceedings by the Court of Appeals; Judgment of the Tennessee State Board of Equalization Assessment Appeals Commission Affirmed in Part, Reversed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Everett B. Gibson and Joni K. Roberts, Memphis, Tennessee, for the appellant, TECO Barge Line, Inc. n/k/a U.S. United Barge Line, LLC.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Mary Ellen Knack, Senior Counsel, for the appellees, Tennessee Comptroller of the Treasury and the Assessment Appeals Commission of the State Board of Equalization.

**OPINION**

## I. Background

The Appellant, TECO Barge Line, Inc. n/k/a U.S. United Barge Line, LLC ("United"),[1] is a water transportation carrier company registered with the U.S. Army Corps of Engineers that owns and operates tugboats and barges for hire over waterways throughout the central and southeastern portions of the United States. United's barges mostly carry coal, grain, aggregate grain and steel over the Ohio, Illinois and Mississippi Rivers. Within Tennessee, the majority of United's boats and barges traverse the Mississippi River, though it regularly utilizes the Tennessee River for its barges traveling between Alabama and Kentucky. United is not domiciled in Tennessee nor does it own or lease any real property in Tennessee.

In 2000 and 2002, the Office of State Assessed Properties ("OSAP"), a division of the Tennessee Comptroller of the Treasury, sent an ad valorem tax report questionnaire to United to determine United's tax liability. United completed and returned the questionnaires each year, but OSAP did not assess any tax in those years. In 2005, OSAP again required United to complete an ad valorem tax report questionnaire and in July 2005, OSAP issued a notice assessing an ad valorem personal property tax for the 2005 tax year.[2] United appealed the assessment to the Tennessee State Board of Equalization.[3] In August 2006, OSAP assessed United for the tax year 2006 and retroactively assessed or "back assessed" United for tax years 2003 and 2004. United also appealed these assessments, which were then consolidated with United's appeal of the 2005 assessment.

In January 2008, a hearing was conducted by an Administrative Law Judge to consider United's appeal of the 2005 and 2006 assessments as well as the 2003 and 2004 back assessments. The ALJ determined that United was subject to taxation under Tenn. Code Ann. § 67-5-1301 because it is a water transportation carrier company that operates boats and barges over the waterways of Tennessee for hire that is also registered with the U.S. Army Corps of Engineers; consequently, the ALJ upheld the tax assessments for 2005 and 2006.

---

[1] In the Fall of 2007, U.S. United Barge Line, LLC, acquired all of the assets of TECO Barge Line, Inc., including its rights of appeal in this case. Prior to 2002, TECO Barge Line, Inc., was named Mid-South Towing Company, Inc., which was changed by charter amendment in 2002.

[2] The notice was not received by United because it was directed to the incorrect zip code; United learned of the assessment through a conversation with an OSAP analyst on September 28, 2005.

[3] Despite being untimely under the statute, United requested in letter to the Board of Equalization on October 24, 2005, that the Board defer "certification" of the assessment and allow United's appeal due to fact that United did not receive proper notice of the assessment. Although the record contains no response from either OSAP or the Board, it is apparent that the Board allowed United's appeal to go forward.

The ALJ found that OSAP had the authority to retroactively assess taxes and found no proof that OSAP had selectively enforced its authority or issued the back assessments in retaliation for United's appeal of the 2005 assessment; the ALJ found, therefore, that United was liable for the 2003 and 2004 assessments. United appealed the ALJ's decision to the Assessment Appeals Commission of the State Board of Equalization. Following a hearing, the Commission issued its Final Decision and Order, which upheld the tax assessments for 2005 through 2008[4] on the grounds that United was properly classified as a water transportation carrier company and that application of the classification statute did not violate the Commerce Clause; the decision also upheld the back assessments for 2003 and 2004 finding insufficient proof to establish a constitutional violation. United appeals the Commission's Final Decision and Order.

## II. Standard of Review

This is a direct appeal from a final decision of the Tennessee State Board of Equalization Assessment Appeals Commission pursuant to Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii). Judicial review of decisions of commissions is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h) rather than the broad standard of review used in other civil appeals. *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279-80 (Tenn. Ct. App. 1988). A court may modify or reverse the decision of the commission if the petitioner's rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

1) In violation of constitutional or statutory provisions;
2) In excess of the statutory authority of the agency;
3) Made upon unlawful procedure;
4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
5) (A) Unsupported by evidence which is both substantial and material in the light of the entire record.
   (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

---

[4] United was assessed ad valorem property taxes by OSAP in 2007 and 2008 for those tax years. United appealed of each of these assessments, which appeals were consolidated with United's original appeal of the 2005 tax assessment.

## III. Analysis

As a preliminary matter, we must determine the extent to which the Commission had the authority to consider and decide United's challenge to the assessments on the constitutional bases asserted. The matter before us was brought before the Board of Equalization to challenge the classification of the taxpayer and the resulting assessment of taxes imposed in 2005 and subsequent years pursuant to Tenn. Code Ann. § 67-5-1301. In addition, United challenged the assessment of taxes for 2003 and 2004, which were imposed pursuant to the power granted at Tenn. Code Ann. § 67-1-1002.

The powers of the state board of equalization are set forth at Tenn. Code Ann. §§ 4-3-5103 and 67-1-305. Under both statutes, the board is authorized, *inter alia,* to consider evidence and determine appeals relative to the "value, classification and assessment of property."[5] The ability of administrative tribunals such as the board to hear constitutional claims was before our Supreme Court in *Colonial Pipeline Co. v. Morgan,* 263 S.W.3d 827 (Tenn. 2008), and the following discussion gives guidance to our consideration of this question:

> Administrative tribunals do not lack the authority to decide every constitutional issue. It is essential, however, to distinguish between the various types of constitutional issues that may arise in an administrative context. In *Richardson* [*v. Board of Dentistry,* 913 S.W.2d 446 (Tenn. 1995)], we developed three broad categories of constitutional disputes: (1) challenging the facial constitutionality of a statute authorizing an agency to act or rule, (2) challenging the agency's application of a statute or rule as unconstitutional, or (3) challenging the constitutionality of the procedure used by an agency. [Citation omitted]. Administrative tribunals have the power to decide constitutional issues falling into the second and third categories, but the first category falls exclusively within the ambit of the judicial branch.

---

[5] The language of Tenn. Code Ann. § 4-3-5103 applicable to the instant proceeding is as follows:

The state board of equalization has the following duties and functions to: . . .
(4) Receive, hear, consider and act upon complaints and appeals made to the board regarding the valuation, classification and assessment of property in the state;....

The applicable language of Tenn. Code Ann. § 67-1-305 is:

(a) The board is vested with the power to : . . .
(2) Obtain such evidence, information and statistics as may be deemed material as to the values, classifications and assessments of properties to be equalized.

263 S.W.3d at 843.

Before the Commission, United contended that the tax imposed by Tenn. Code Ann. § 67-5-1301, as applied to it, violated the Commerce Clause of the U.S. Constitution.[6] United also contended that taxes assessed pursuant to Tenn. Code Ann. § 67-1-1002 were imposed in retaliation for its appeal of the 2005 assessment, thereby penalizing United for the exercise of its First Amendment right to petition for the redress of grievances. The Commission rejected the constitutional challenges and upheld both assessments. In so doing, the Commission acknowledged that United was not making a facial attack on the constitutionality of Tenn. Code Ann. §§ 67-5-1301 or 67-1-1002. The Commission properly confined its consideration of the constitutional concerns to the limits set in *Colonial Pipeline.*

Our review of the Commission's decision necessarily involves a three-step analysis. *McEwen v. Tenn. Dept. of Safety*, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005). We first determine whether the Commission identified the appropriate legal principles applicable to the case and then examine the Commission's factual findings, if any, to determine whether the findings are supported by substantial and material evidence. *Id.* Finally, we examine how the Commission applied the law to the facts. *Id.* The application of the law to the facts is a highly judgmental process involving mixed questions of law and fact. *Miller v. Civil Service Comm'n of Metropolitan Government of Nashville and Davidson County*, 271 S.W.3d 659, 664 (Tenn. Ct. App. 2008) (citing *Armstrong v. Metro. Nashville Hosp. Auth.*, No. M2004-01361-COA-R3-CV, 2006 WL 1547863, at *2 (Tenn. Ct. App. Jun. 6, 2006). Consequently, courts may neither reweigh the evidence nor substitute their judgment for the commission's, rather courts "must determine whether a reasonable person could appropriately have reached the same conclusion reached by the commission, consistent with a proper application of the controlling legal principles." *Miller*, 271 S.W.3d at 664; *McEwen*, 173 S.W.3d at 820.

### Commerce Clause Claim

In determining Commerce Clause challenges, we are instructed by the U.S. Supreme Court to evaluate the validity of state law pursuant to the four-pronged standard established in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). Under the *Complete Auto* test, state taxes are upheld as nonviolative of the federal Commerce Clause provided that (1) the

---

[6] In addition to its "as applied" constitutional claim, United also asserted before the Commission that its classification as a water transportation carrier company under Tenn. Code Ann. § 67-5-1301(a)(13) was improper based on United's interpretation of the language of the statute. The parties' appellate briefs included arguments on this issue; however, during oral argument, United's attorney informed the Court that it did not intend to pursue its statutory construction argument. Consequently, we do not address the parties' statutory construction arguments.

tax is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. *Id.* at 279; *accord Maryland v. Louisiana*, 451 U.S. 725, 754 (1981); *see also General Motors Corp. v. Washington*, 377 U.S. 436 (1964); *Northwestern Cement Co. v. Minnesota*, 358 U.S. 450 (1959); *Memphis Gas Co. v. Stone*, 335 U.S. 80 (1948); *Wisconsin v. J. C. Penney Co.*, 311 U.S. 435, 444 (1940). In announcing this four-part test, "the court . . . rejected the line of cases holding that the direct taxation of interstate commerce was impermissible and adopted instead a 'consistent and rational method of inquiry [that focused on] the *practical effect* of [the] challenged tax.'" *Quill Corp. v. North Dakota By and Through Heitkamp*, 504 U.S. 298, 303-04 (1992) (quoting *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 U.S. 425, 443 (1980)) (emphasis added).

The Supreme Court made it clear in *Quill Corp.* that the "four-part test [of *Complete Auto*] . . . continues to govern the validity of state taxes under the Commerce Clause" and confirmed that under our current Commerce Clause jurisprudence, "with certain restrictions, interstate commerce may be required to pay its fair share of state taxes." 504 U.S. at 310; *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 31 (1988); *see also Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 623-24 (1981) ("It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of [the] state tax burden even though it increases the cost of doing business.").

United does not assert that the tax assessment at issue discriminates against interstate commerce or that it was unfairly apportioned in this case; rather, United contends that the assessment violates the first and fourth prong of the *Complete Auto* test. We, therefore, address these specific contentions.

1.  Substantial Nexus

The tax at issue, Tenn. Code Ann. § 67-5-1301, authorizes and directs the comptroller of the treasury to assess for taxation property within the state that is owned, used, and/or leased by certain types of companies including:

> water transportation carrier companies which operate boats and barges over the waterways of this state for hire, which are registered with the United States army corps of engineers or any other federal or state agency and/or domiciled in this state and/or owning or leasing real or personal property located in this state.

Tenn. Code Ann. § 67-5-1301(a)(13). The tax expressly applies only to property used within the State.

-6-

United's President, David O'Neill, testified before the ALJ that, during the tax years at issue, United owned and operated 20 tugboats and 700 barges, which principally traveled over the Ohio, Illinois and Mississippi Rivers, including the portion of the Mississippi River that flows through Tennessee. Mr. O'Neill explained that 95-98 percent of United's operations within Tennessee consisted of boat and barge traffic on the Mississippi River. The other two to five percent consisted of barges that traveled over the Tennessee River from points in Alabama, through Tennessee, to a facility owned by United in Paducah, Kentucky; United did not operate any tugboats on the Tennessee River. Mr. O'Neill testified that in 2005, the first year the tax was assessed, United loaded forty-four barges in Alabama that traveled through Tennessee along the Tennessee River destined for Kentucky; United loaded two barges on the Tennessee River within Tennessee borders. With respect to loadings on the Mississippi River, Mr. O'Neill testified that none of United's barges terminated in Tennessee, but that in 2005, United had seventeen loadings of products originating from Tennessee; Mr. O'Neill did not testify as to the total number of United's boats and barges that traveled on the Mississippi River through Tennessee in 2005. Mr. O'Neill testified that the loadings in Tennessee were not scheduled or part of United's "normal operating procedure"; rather, they were done at the request of other barge lines and only represented .02-.03 percent of United's 5,561 barge loadings system wide. While United's loadings within Tennessee represented a small portion of its system-wide loadings, Mr. O'Neill's testimony supports the Commission's determination that United regularly traveled within Tennessee over the Mississippi and Tennessee Rivers to conduct its boat and barge operations during the tax years in question.

United contends, without citation to any authority, that "[v]essels must habitually use a state's *ports* in substantial numbers to justify requiring the vessels to share in the tax burden." (Emphasis added). United argues that substantial use of a state's ports, as opposed to merely "regular traffic," should be the basis for finding a substantial nexus with respect to taxes levied on boats and barges because boats and barges floating along a river do not burden a state's infrastructure to the same extent as trucks or railroads.

We find no support for such a contention in either state or federal law. To the contrary, the U.S. Supreme Court has repeatedly held that water transportation carriers are held to the same constitutional standards as other interstate transportation carriers. *Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169, 174 (1949) ("We can see no reason which should put water transportation on a different constitutional footing than other interstate enterprises."); *Standard Oil Co. v. Peck*, 342 U.S. 382, 384 (1952). Since *Ott*, both state and federal courts have held that regular traffic through a state, including boat and barge traffic over a state's waterways, is sufficient to create a substantial nexus. *See Central R.R. Co. of Pa. v. Commonwealth of Pa.*, 370 U.S. 607, 614 (1962); *Braniff Airways, Inc. v. Nebraska Board of Equalization*, 347 U.S. 590, 600 (1954); *Standard Oil*, 342 U.S. at 384; *Jack Cole*

-7-

*Co. v. Ellington*, 372 S.W.2d 204, 208 (Tenn. Ct. App. 1961); *see also Union Barge Line Corp. v. Marcum*, 360 S.W.2d 130, 132-33 (Ky. Ct. App. 1962).

In *Central Railroad*, the U.S. Supreme Court, relying in part on its prior ruling in *Standard Oil*, held that "the State through which the regular traffic flowed could impose a property tax measured by some fair apportioning formula." *Central R.R. Co. of Pa.*, 370 U.S. at 614. The Court noted that the record in *Standard Oil* showed that the boats and barges which Ohio sought to tax in full had been traveling along three regular routes on the Mississippi and Ohio Rivers: from Memphis, Tennessee, to Mt. Vernon, Indiana; from Memphis, Tennessee, to Bromley, Kentucky; and from Baton Rouge or Gibson's Landing, Louisiana, to Bromley, Kentucky. The Court then observed that "[t]he States in which the vessels landed, *as well as those through which they regularly traveled, could undoubtedly have traced these regular trips and levied appropriately apportioned ad valorem taxes*." *Id.* at 615, n. 6 (emphasis added). Applying the principles of *Central Railroad* to this case, we find that United's regular traffic over both the Mississippi and Tennessee Rivers through the State of Tennessee provide the substantial nexus required to allow Tennessee to impose a property tax measured by a fair apportioning formula.

United also suggests that, because more than 95 percent of its River traffic within Tennessee is on the Mississippi River and since the Mississippi River is a federally regulated waterway, there is insufficient nexus with Tennessee. This argument also lacks merit. While it is true that navigation of the Mississippi River is regulated by Congress, such regulation does not divest Tennessee of title to the beds and banks of the river or the authority to tax vessels traveling over the river through the territory of the State. *See*, *e.g.*, *Braniff*, 347 U.S. at 596-97. In *Braniff*, the U.S. Supreme Court analogized planes flying interstate with boats traveling inland waters and explained a state's authority to tax such enterprises thusly:

> The commerce power, since *Gibbons v. Ogden*, 9 Wheat. 1, 193, 6 L.Ed. 23, has comprehanded [sic] navigation of streams. Its breadth covers all commercial intercourse. But the federal commerce power over navigable streams does not prevent state action consistent with that power. Since, over streams, Congress acts by virtue of the commerce power, the sovereignty of the state is not impaired. The title to the beds and the banks are in the states and the riparian owners, subject to the federal power over navigation. Federal regulation of interstate land and water carriers under the commerce power has not been deemed to deny all state power to tax the property of such carriers.

*Braniff*, 347 U.S. at 596-97 (internal citations omitted); *see also Bean Dredging Corp. v. Olsen*, 742 S.W.2d 259 (Tenn. 1987) ("The boundary between Tennessee and Arkansas lies generally in the Mississippi River."); *Higman Towing Co. v. Cocreham*, 70 F.Supp. 628, 636 (D.C.La. 1947) ("[T]he fee of the beds of navigable waters became the property of the

individual states when admitted into the Union, by virtue of their inherent sovereignty. This ownership, however, was subject to the paramount control of the Federal Government over navigation and commerce on those waters."). As aforestated, we find that United's habitual and systematic utilization of and presence on the waterways of Tennessee established a substantial nexus with Tennessee to subject United to the State's taxation.

## 2. Fairly Related to Services Provided

Under the *Complete Auto* test, a state's tax will be upheld if, along with the other three criteria, it is "fairly related to the services provided by the state." *Complete Auto Transit*, 430 U.S. at 279. "The validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which [it] bears a special relation." *Commonwealth Edison*, 453 U.S. at 625. There is no requirement, however, that the amount of the tax collected from a particular activity be reasonably related to the value of the services provided to the activity. *Id.* at 622. In *Commonwealth Edison*, the U.S. Supreme Court examined this prong of the *Complete Auto* test in detail and explained that:

> The relevant inquiry under the fourth prong of the *Complete Auto Transit* test is not . . . the *amount* of the tax of [sic] the *value* of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities. Rather, the test is closely connected to the first prong of the *Complete Auto Transit* test. Under this threshold test, the interstate business must have a substantial nexus with the State before *any* tax may be levied on it. Beyond that threshold requirement, the fourth prong of the *Complete Auto Transit* test imposes the additional limitation that the measure of the tax must be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a "just share of [the] state tax burden."

*Id.* at 626 (internal citations omitted). Consequently, the Court explained, "[t]he simple but controlling question is whether the state has given anything for which it can ask return." *Id.* at 625 (quoting *Wisconsin v. J.C. Penney Co.*, 311 U.S. at 444).

United asserts that it "derives no benefits from state and local governments in its Tennessee operations with very few sporadic exceptions." United relies on Mr. O'Neill's testimony that United's boats and barges do not use local assistance while "in transit." United argues that it has no need for Tennessee emergency services such as police or firefighters as its boats and barges would use federal assistance if such services were needed while in

transit.[7] United also asserts that it does not regularly purchase supplies from vendors located in Tennessee nor does it regularly use any maintenance or repair facilities located in Tennessee. Finally, United again attempts to distinguish its operation of vessels over inland waterways from those of railroads and trucks that travel across the state on rails and roads by asserting that the Federal government, not the State, maintains and controls navigation of the Mississippi River. United asserts that its boats and barges "just go[] up and down a river contiguous to Tennessee without stopping, without taking on crew, without taking on provisions and without obtaining repairs or maintenance services."

United's attempt to quantify the exact services, such as police and fire protection, that it does not regularly use while traversing the State is misplaced. United's actual use or non-use of these services is irrelevant to the inquiry. *See Commonwealth Edison,* 453 U.S. at 628. So long as there is some service or benefit provided by the State and the tax levied is apportioned to the extent of the contact with the State the tax does not run afoul of the Commerce Clause. *Id.* Further, we remain unpersuaded by United's argument that water transportation carriers are different from other interstate transportation carriers in the context of government provided services. We acknowledge that vessels traveling over inland waterways may not use all of the same services that vehicles traveling on an interstate highway or railroad may use, but such differences do not change the analysis as "interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct benefit." *Id.* at 628, n. 16. "The only benefit to which the taxpayer is constitutionally entitled [is] that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes." *Id.* at 628-29 (quoting *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 521-22 (1937)).

The tax here was levied on United's personal property located within the State of Tennessee. There is no dispute that the tax was not properly apportioned to the property actually located within the borders of Tennessee. We find, therefore, that the tax is in "proper proportion" to United's activities within the State and, as a result, to its "consequent enjoyment of the opportunities and protections which the State has afforded" in connection with those activities. *See Commonwealth Edison*, 453 U.S. at 626-27. Having also found that a substantial nexus exists between United and the State of Tennessee, we find that the ad valorem property tax assessments from 2005 through 2008 satisfy the four prongs of the *Complete Auto* test and, thus, are nonviolative of the Commerce Clause. Consequently, we affirm the Commission's Final Decision and Order holding the same.

---

[7] Mr. O'Neill testified that if United was in need of law enforcement, it would contact the U.S. Coast Guard. He also testified that under federal law, water transportation companies like United were required, as a condition to operate on inland waterways, to provide their own fire suppressant systems and certified fire suppressant operators.

## First Amendment Claim

United argued before the Commission that, in assessing taxes for 2003 and 2004, OSAP selectively enforced Tenn. Code Ann. § 67-1-1002, *et. seq.*, in violation of the Equal Protection Clause of the Fourteenth Amendment and that such enforcement "evidence[d] retaliation for United's exercise of its First Amendment right to redress grievances." The majority of the Commission[8] found that there was "[in]sufficient proof to establish a constitutional violation," holding:

> We believe the assertion that OSAP's actions were vindictive or selective is not borne out by the record. The proof does not establish that [United] was singled out by OSAP and does not establish that OSAP's actions rested on an impermissible consideration or purpose. Nor can OSAP be estopped from carrying out is duty under Tenn. Code Ann. §[§] 67-5-1301(c), 67-1-1002(a)(1), and 67-1-1005(a) on the basis of presumably innocent misinterpretations of the statue by its employees and/or [United].

On appeal, United does not assert that OSAP's assessment for prior tax years was selective, only that the back assessments were issued in retaliation for United's appeal of the original tax assessment in 2005, which United characterizes as its First Amendment right to redress grievances.

It is well-established that governmental action, which standing alone does not violate any law or constitution, may nonetheless be a tort if motivated in substantial part by a desire to punish an individual for exercise of a statutory or constitutional right. *See*, *e.g.*, *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (untenured teacher who could have been fired for no reason may nonetheless establish a claim if the decision not to rehire him was made because of his exercise of First Amendment freedoms); *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (inmate moved allegedly in retaliation for his effort to litigate the claim of another inmate was actionable); *Board of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir. 1997) ("[A] claim of retaliation for exercise of the constitutional right of access is cognizable under

---

[8] Two of the five members of the Commission dissented from the conclusion that the back assessments for the years 2003 and 2004, as applied to United under the circumstances, were constitutionally sound.

-11-

[U.S.C.] § 1983."); *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("retaliation under color of law for the exercise of First Amendment rights is unconstitutional").

A person making a claim that governmental action was improperly motivated, *e.g.,* in retaliation for that person's exercise of statutory or constitutionally protected rights, bears the initial burden of establishing a *prima facie* case that the challenged action was so motivated.[9] *Mount Healthy*, 429 U.S. at 287; *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). This can be done either by presenting direct evidence of retaliation or through circumstantial evidence. In this case, the evidence relied upon by United in support of its claim was circumstantial.[10] When the claim is based on circumstantial evidence, such as the timing of events or the disparate treatment of similarly situated individuals, courts are to apply the burden-shifting analysis established in *McDonnell Douglas*. 411 U.S. at 802; *McClain v. Nw. Community Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006); *see also Thaddeus-X*, 175 F.3d at 399.

Once the claimant has met the initial burden of establishing a *prima facie* case, the burden of going forward shifts to the governmental entity to articulate a legitimate, constitutional reason for the challenged action. *See McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the entity comes forward with a legitimate, constitutional reason, the presumption of retaliation is rebutted and the burden of going forward returns to the claimant to produce sufficient evidence from which the fact-finder may reasonably reject the entity's explanation. *Burdine*, 450 U.S. at

---

[9] The analytical framework of such a challenge, as discussed more fully below, is essentially the same regardless of context (*e.g.*, employment, prison, regulatory), allegation (*e.g.*, discrimination or retaliation) or the grounds (*e.g.*, common law, state or federal law or constitutional). *See*, *e.g.*, *Thaddeus-X*, 175 F.3d at 399 (applying the *Mount Healthy* burden-shifting analysis to inmate First Amendment retaliation case and explaining that many other circuits have applied such in other non-employment cases); *McCray v. Vanderbilt Univ.*, No. M2008-00364-COA-R3-CV, 2009 WL 1819247, at *5-6 (Tenn. Ct. App. Jun. 23, 2009) (applying the *McDonnell Douglas* burden-shifting analysis to Family and Medical Leave Act retaliation and common law retaliatory discharge claims); *Love v. Electric Power Bd. of Chattanooga*, No. 1:07-cv-80, 2009 WL 1514436 (E.D. Tenn. May 29, 2009) (applying the *McDonnnel Douglas* burden-shifting analysis to an age discrimination claim under the ADEA);

[10] Direct evidence is that evidence which, if believed, requires the conclusion that improper motive was at least a motivating factor in the governmental action, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999), and does not require a fact finder to draw any inferences in order to conclude that the challenged action was motivated, at least in part, by the claimant's protected activity. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When a plaintiff presents direct evidence of discrimination or retaliation, the burden of both production and persuasion shifts to the governmental entity to prove that it would have taken the same action in the absence of the protected activity. *Mount Healthy*, 429 U.S. at 287; *Thaddeus-X*, 175 F.3d at 399; *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

255-56; *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). A claimant may show that the reason offered was mere pretext by demonstrating by a preponderance of the evidence either that the proffered reasons had no basis in fact or that a prohibited reason more likely than not motivated the entity. *Burdine*, 450 U.S. at 252-53; *Terry v. Gallegos*, 926 F.Supp. 679, 693 (W.D. Tenn. 1996) (quoting *Manzer*, 29 F.3d at 1084); *see also McCray v. Vanderbilt University*, No. M2008-00364-COA-R3-CV, 2009 WL 1819247, at *5-6 (Tenn. Ct. App. Jun. 23, 2009).

While the intermediate burdens of going forward shift back and forth under this framework, the ultimate burden of persuasion remains at all times with the claimant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In making a determination of whether the evidence proves a statutory or constitutional violation, "the court should consider reasonable inferences drawn from the totality of facts, the conglomerate of activities, and the entire web of the circumstances presented by the evidence on the record as a whole." *Gallegos*, 926 F.Supp. at 693 (citing *Ford v. Nicks*, 703 F.Supp. 1296, 1303 (M.D. Tenn. 1988)); *accord EEOC v. St. Joseph Paper Co.*, 557 F.Supp. 435, 439 (W.D. Tenn. 1983)).

Before engaging in the burden-shifting analysis, we must examine the record to determine the facts as the Commission did not make specific findings of fact.

In 2005, OSAP added seven companies, including United, to the master list of assessable water transportation carriers and assessed those companies the ad valorem property tax authorized at Tenn. Code Ann. § 67-5-1301 for the first time. United appealed the assessment in accordance with Tenn. Code Ann. § 67-5-1327, first to the Comptroller of the Treasury and then to the State Board of Equalization for review pursuant to Tenn. Code Ann. § 67-5-1328. Within a year of United's original assessment and appeal, OSAP "back assessed" United ad valorem property taxes for the tax years 2003 and 2004 in accordance with Tenn. Code Ann. §§ 67-1-1002 and 1005. Gary Harris, OSAP Assistant Director of Assessments, testified that OSAP's policy or "routine" with respect to back assessments was to "giv[e] the benefit of the doubt to the taxpayer" in the initial year of discovery and, therefore, not issue a back assessment. Mr. Harris testified that of the 25 taxpayers added to OSAP's assessable master list between 1997 and 2006, only two were back assessed [per 67-1-1002]. One was United; the other was Alter Barge Line, which was "force assessed" because it had refused to complete and submit an ad valorem tax report questionnaire or to pay any of the taxes assessed.[11] The record also shows that of the companies originally assessed in 2005, as United was, United was the only one that appealed the assessment.

_____

[11] Alter Barge Line was not one of the new companies added in 2005.

-13-

The foregoing circumstantial evidence established a *prima facie* case that the assessment of taxes for 2003 and 2004 may have been made in response to United's appeal of the 2005 assessment;[12] OASP was then required to articulate the reason for its decision to impose the back assessment. Barry Murphy, Director of OSAP testified that it was OSAP's responsibility when it discovered properties which had not been assessed "to go back to what the extent of the law would allow." In its argument, OSAP also relies on Tenn. Code Ann. § 67-1-1002 to support director Murphy's testimony that OSAP is required by the statute to back assess properties that have been omitted or escaped taxation. OSAP, therefore, satisfied its burden of production, which shifted the burden back to United to demonstrate by a preponderance of the evidence that these reasons were merely pretext for OSAP's improper motive. We, therefore, turn to a consideration of the entire evidence to determine if United met its burden of persuasion.

In deposition testimony of OSAP director Murphy, Gary Harris, the assistant director, Patricia Dodson, an analyst, and Shannon Tucker, an analyst, introduced at the hearing, several possible reasons why the six other companies added in 2005 were not back assessed were given, including that some additions may have represented name changes rather than new taxpayers,[13] that some may have been locally assessed for previous years, or that some may not have operated over Tennessee waterways for previous years. The OSAP employees, however, did not know whether any of these possible explanations actually applied to any of the six other companies added to the assessable master list in 2005. Consequently, this testimony had no probative value. Additionally, while Mr. Harris testified that "[i]f we can discover that that company did indeed operate on the waterways in Tennessee . . . we can go back and back assess the company," he also testified that it was OSAP's "routine" to give the taxpayer the benefit of the doubt the initial year that the taxpayer is discovered and not issue an assessment for previous tax years. When asked by United's counsel to explain the reason

---

[12] Sufficient circumstantial evidence showing a causal connection between the protected activity and the challenged action raises an inference that an improper motive was, at least in part, a motivating factor in the decision to act. *See*, *e.g.*, *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *Walburn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998); *Lyons v. Metro. Gov't of Nashville and Davidson County,* No. 3:08-0804, 2009 WL 2431430, at *6 (M.D. Tenn. Aug 07, 2009); *Harris v. Metro. Gov't of Nashville and Davidson County*, No. 3:04-0762, 2005 WL 3143973, *4 (M.D. Tenn. Nov 23, 2005); *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749 (2d Cir. 2004); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115 (8th Cir. 1981).

[13] Each year, OSAP conducted, what it called, a discovery process to discover new or previously unreported taxpayers. Mr. Tucker testified that any newly discovered taxpayer would be added to the assessable master listing in the year it was discovered. OSAP created a new assessable master listing each year. Mr. Tucker testified that when a taxpayer's name changed, whether as a result of a merger or acquisition or any other reason, the taxpayer's new name would be used in the next year's assessable master listing; however, the list did not indicate which taxpayers on the list were newly discovered taxpayers as compared to an existing taxpayer that simply changed its name.

for the back assessment against United, Mr. Harris provided no explanation other than that United's appeal "had nothing to do with the back assessment." Director Murphy testified that the assessment analyst was the person that would know whether a company had been operating over Tennessee waterways in previous years and would make the decision to issue a back assessment; however, the water transportation carrier analyst, Shannon Tucker, testified that either Mr. Harris or Mr. Murphy made the decision to back assess a company and that, in the case of United, "we got some ad valorem returns, and they were for back years, so I just went ahead and worked up what [Mr. Harris] told me to work up." Mr. Tucker also testified that the only back assessment he had ever done since he began working at OSAP in 2001 was that issued against United.

The preponderance of the evidence shows that the 2003 and 2004 assessments were imposed after United had exercised its right under Tenn. Code Ann. § 67-5-1327 to appeal the 2005 assessment to the board of equalization. Further, the evidence shows that United was the only water transportation carrier of the seven originally assessed in 2005 that exercised its statutory right to appeal the assessment and was the only one assessed back taxes. This evidence is sufficient to infer that the reexamination of United's operations prior to 2005 was prompted by the appeal and resulted in the assessment of taxes for 2003 and 2004, especially in light of OSAP's failure to explain why, in the case of United, it chose to deviate from its "routine" of giving the taxpayer the benefit of the doubt in the initial year of discovery and not issue an assessment for previous tax years. OSAP's assertion that, from correspondence with United in 2000 and 2002, it knew that United was operating barges on Tennessee waterways prior to 2005 and that, pursuant to the statute, OSAP had a statutory duty to assess property that had escaped taxation, fails to rebut the inference that the decision to make the back assessment was predicated upon United's appeal of the 2005 assessment.[14] *See Wade, supra*, 259 F.3d at 463. Being unrebutted, the inference allows us to conclude that the 2003 and 2004 assessments were made as a result of United's appeal of the 2005 assessment. *See Gallegos*, *supra*, 926 F.Supp. at 693 ("Rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."); *see also Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (If the claimant proffered sufficient evidence to raise the inference that her protected activity was the likely reason for the adverse action and can subsequently show that the excuse offered for the action was merely a pretext for discrimination or retaliation, then a causal link is established and liability results); *Cf. Hamilton v. Rodgers*, 791 F.2d 439, 442

---

[14] In 2000 and 2002, United provided OSAP with information about its operations and it was not added to the assessable master list in those years. The record showed that companies were only added to the assessable master list if the company was determined to be subject to the ad valorem property tax. The back assessment issued in 2005 for tax years 2003 and 2004 is inconsistent with the non-assessment in the years in which the information was provided to OSAP.

(5th Cir.1986); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982); *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

The General Assembly, in enacting Tenn. Code Ann. §§ 67-5-1327 and 1328, expressly provided for a taxpayer's right to appeal tax assessments and the mechanism by which such right should be exercised. When a governmental entity acts in such a way that punishes or deters an individual or organization from exercising rights granted by the legislature of this State, such action is against the public policy of Tennessee. Accordingly, the Commission's holding based on constitutional grounds[15] relied on improper legal principles in addition to being made without reference to any factual findings. Having found evidence that, under the circumstances, the issuance of the back assessments violated United's statutory right to appeal the original assessment and, thereby, OSAP violated the public policy of Tennessee, we reverse that portion of the Commission's Final Order upholding the back assessment and absolve United of its liability for the ad valorem property assessments for tax years 2003 and 2004.

## IV. Conclusion

As aforestated, we find that the Commission correctly determined that Tenn. Code Ann. § 67-5-1301 as applied to United did not contravene the Commerce Clause of the United States Constitution and, consequently, we affirm the Commission's decision to uphold the ad valorem property tax assessments against United for the tax years 2005-2008. We must, however, reverse the Commission's decision to uphold the assessments for tax years 2003 and 2004 for the reasons set forth above.

Costs of the appeal are assessed to the parties equally.

_____

RICHARD H. DINKINS, JUDGE

---

[15] While the Commission held generally that there was "[in]sufficient proof to establish a constitutional violation," it appears to have limited its legal analysis to United's claim under the Equal Protection Clause of the Fourteenth Amendment as the Commission's Final Decision and Order only referenced the elements of a selective or vindictive enforcement claim, which is a doctrine developed within equal protection law.